FIRST EQUITY CORPORATION OF FLORIDA, a Florida Corporation, Plaintiff and Appellant,

v.

UTAH STATE UNIVERSITY, a body politic and corporate, and Donald A. Catron, an Individual, Defendants and Respondents,

Bear Stearns & Co., Bosworth-Sullivan & Company, Inc., et al., Amici Curiae.

No. 13798.

Supreme Court of Utah.

Dec. 23, 1975.

Norman S. Johnson, Randall P. Spackman and Christine M. Durham of Johnson & Spackman, Salt Lake City, for plaintiff and appellant.

Vernon B. Romney, Atty. Gen., David L. Wilkinson, Asst. Atty. Gen., Salt Lake City, for Utah State U.

Darwin C. Hansen, Bountiful, for Catron.

Keith E. Taylor of Parsons, Behle & Latimer, Salt Lake City, for Bear Stearns & Co., amici curiae.

Harold G. Christensen of Worsley Snow & Christensen, Salt Lake City, for Sullivan & Co., amici curiae.

HYDE, District Judge:

This is an action brought by a stock broker, First Equity Corporation of Florida, against Utah State University (USU) and Donald A. Catron, formerly the Assistant Vice-President of Finance of Utah State University, for the recovery of commissions and other monies lost by First Equity as a result of USU's refusal to accept and pay for certain shares of common stock which had been ordered by Catron for USU.

First Equity filed a Motion for Summary Judgment and USU filed a Cross-Motion for Summary Judgment based on its affirmative defense that the orders for the purchase of stock which Catron placed on behalf of USU were ultra vires in that USU had no power to purchase stock and, therefore, USU had no obligation to pay for the stock or any commissions.

First Equity appeals from the Trial Court's denial of their Motion and the granting of Summary Judgment to USU. The defendant Catron is not involved in the Motions or this appeal.

USU authorized Catron to purchase securities of any kind through any broker who was a member of any major securities exchange or the National Association of

Securities Dealers. Pursuant to this authority, Catron opened a special cash account with First Equity and through that account Catron ordered and USU received and accepted and paid for certain securities. After receiving an opinion from the Attorney General's office that USU should not be investing in stocks, USU refused to accept delivery and pay for the stocks giving rise to this action.

USU revoked Catron's authority prior to the purchase of the stocks in question but apparently neither the resolution granting Catron authority nor the resolution revoking his authority was transmitted to First Equity.

The case of *The University of Utah v. The Board of Examiners of the State of Utah,* 4 Utah 2d 408, 295 P.2d 348, which determined the status of the University of Utah would be applicable to Utah State University. USU is a corporation and thus constitutes a legal entity with limited capacity. It was created and exists for the sole purpose of more conveniently governing and conducting the educational institution. It is a state institution, a public corporation[1] not above the power of the Legislature to control and is subject to the laws of this state from time to time enacted relating to its purposes and government.

Utah State Legislature has from time to time exercised control over USU and given USU some power of investment. The direct question presented here is whether or not USU is empowered to invest in common stock with public funds.

It is the position of First Equity and the Amici Brokers that USU had the power to invest in common stock as part of its general power to control and supervise all appropriated and donated funds.

USU was created in 1888 (*Compiled Laws of Utah,* Section 1855) and a govern-

ing Board of Trustees was established with the following duties and powers:

They shall have the *general control* and supervision of the agricultural college, the farm pertaining thereto, and such lands as may be vested in the college by Territorial legislation, of *all appropriations* made by the Territory for the support of the same, and also of lands that may hereafter be donated by the Territory . . . or by any person or corporation, in trust for the promotion of agricultural and industrial pursuits. . . . (emphasis added)

It is this "general control . . . of all appropriations" that appellant claims was perpetrated in 1895 by Article X, Section 4, of Utah Constitution, which provides:

The location and establishment by existing laws of the University of Utah, and the Agricultural College are hereby confirmed, and all rights, immunities, franchises, and endowments heretofore granted or conferred, are hereby perpetuated unto said University and Agricultural College respectively.

In 1929 the Legislature changed the name of the Agricultural College to Utah State Agricultural College and constituted it a "body politic and corporate." In 1957 the Legislature again changed the name, this time to Utah State University of Agricultural and Applied Sciences. The Legislature expressly perpetuated "all rights, immunities, franchises, and endowments heretofore granted or conferred" upon the college. The statute further provided that USU:

. . . may have and use a corporate seal, may sue and be sued and contract and be contracted with. It may take, hold, lease, sell and convey real and

---

1. "A public corporation which is not municipal is one created by the State solely as its own device and agency . . . . A *State University* . . . and a State Board of Education constitute, *if incorporated, illustrations of this class.* Because the independent power of such corporations is frequently nominal, or small . . . and their officers and members (if any) have no individual interest in them, these organizations are sometimes described . . . as public quasi corporations." 1 McQuillin, *Municipal Corporations* (1971 Rev. Vol. Sections 2.03(b) p. 133).

personal property as the interests of the college may require. (UCA 53–32–2)

The Higher Education Act of 1969 (UCA 53–48–10(5)) states each university or college . . . may do its own purchasing, issue its own payroll, and *handle its own financial affairs* under the general supervision of the Board as provided by this Act.

And in addition thereto, the 1969 Act specifies (UCA 53–48–20(3)):

Any institution, college or department or its foundation or organization engaged in a program authorized by the board may:

(c) Accept contributions, grant or gifts from any private organization . . .

(d) Retain, accumulate, invest, commit and expend the funds and proceeds of such authorized programs . . . .

Nothing in the Constitution or legislative action involving USU specifically grants or denies to USU the power to invest state appropriations in common stock. Appellant and Amici contend that the general control and supervision of all appropriations and the granted power to do its own purchasing, is sue its own payroll and handle its own financial affairs are broad, general grants of power and would include the power to invest in common stock in the absence of specific legislative provisions to the contrary.

Whether or not the grant of a "general control" of "all appropriations" and the right to "handle its own financial affairs" grant unrestricted power to invest is answered by *The University of Utah v. Board of Examiners of the State of Utah* (supra) case. After quoting Sections 1 and 2 of Article X of the Constitution which mandates the Legislature to provide for the maintenance of the University of Utah and USU, the Court states:

Would it be contended by the University that under Article X, Section 1, it might compel the Legislature to appropriate money the University considers essential? Is it contended that the demands of the University are not subject to constitutional debt limits? If so, respondent would

have the power to destroy the solvency of the State and all other institutions by demands beyond the power of the State to meet.

The Court then quotes in full Sections 5 and 7 of Article X of the Constitution, which provides, respectively, that the proceeds of the sale of land reserved by Congress for the University of Utah shall constitute permanent funds of the State, *and that all public school funds shall be guaranteed by the State against loss or diversion*. Then the Court concludes:

It is inconceivable that the framers of the Constitution in light of the provisions of Sections 1, 5 and 7 of Article X and the provision as to debt limitations intended to place the University above the only controls available for the people of this State as to the property, management and government of the University. We are unable to reconcile respondent's position that the University has a blank check as to all its funds with no pre-audit and no restraint under the provisions of the Constitution requiring the State to *safely invest* and hold the dedicated funds and *making the State guarantor* of the public school funds *against loss or diversion*. To hold that respondent has free and uncontrolled custody and use of its property and funds while making the State guarantee said funds against loss or diversion is inconceivable. We believe the framers of the Constitution intended no such result. (emphasis added)

■ As stated above, it is clear since *The University of Utah v. Board of Examiners of the State of Utah* (supra) case that USU is clearly a state institution and that it holds property in trust for the State of Utah and is subject to the laws of the State enacted relating to its purposes and government. In this vein it would be similar to a municipal corporation which also derives its powers from the State and deals with public funds.

The approach of common law in interpreting legislative grants of power to public bodies concerning the handling of public monies is illustrated by *National Surety v.*

*State,* 111 Okl. 180, 239 P. 257 (1925), a case involving the question of whether a county treasurer under a statute empowering him to sell bonds initially purchased with county sinking funds, had power to reinvest the proceeds of sale in similar bonds. In holding that he did not, the Court stated:

> It seems certain that, in the absence of statutory authority to invest the sinking funds in his hands, it was the duty of the county treasurer to preserve the sinking funds which came into his official hands intact in money. Before the custodian of the sinking fund could invest such funds in any manner, he must be able to put his finger upon some express statutory provision which would authorize the investment. . . .

This Court has held that municipal powers cannot lightly be inferred by implication. In *Moss v. Board of Commissioners,* 1 Utah 2d 60, 261 P.2d 961 (1953) it was said:

> This Court has not favored the extension of the power of the city by implication, and the only modification of such doctrine is where the power is one which is necessarily implied. Unless this requirement is met, the power cannot be deduced from any consideration of convenience or necessity, or desirability of such result, and no doubtful inference from other powers granted or from ambiguous or uncertain provisions of the law would be sufficient to sustain such authority.

A tendency to narrowly interpret grants of legislative power to municipalities is also seen in *Town of Worland v. O'Dell and Johnson,* 79 Wyo. 1, 329 P.2d 797 (1958):

> . . . all the courts, without a single exception so far as we know, agree that a municipality has only such powers as are granted to it by the legislature. That itself seems to mean that a power not granted is a power prohibited. As stated

in *Van Eaton v. Town of Sydney,* 211 Iowa 986, 231 N.W. 475, 477, 71 A.L.R. 820, citing numerous cases:

> "Where a statute confers certain specific powers, those not enumerated are withheld. *In other words, enumeration of powers operates to exclude such as are not enumerated."* (emphasis added)

■ A general grant to handle its financial affairs does not give authority to invest in common stock. The power to invest is not granted in the absence of legislation to the contrary but the reverse is true. It depends upon a specific authorizing grant of such power.

The only specific Utah statute on the subject of investment of USU would be Section 33–1–1.[2] Section 33–1–1 is a one sentence paragraph containing over 450 words, but the basic structure is: Investments by (named parties) of their own funds or funds in their possession (in specified securities) shall be lawful. The "named parties" include "any private, political or public . . . corporation or person" and its provisions and meaning would apply to USU as a public corporation as well as private persons and private corporations. The "specified securities" enumerated are all government guaranteed securities such as "bonds and other obligations of . . . the United States." The stocks in question in this lawsuit do not fall within enumerated securities set forth in that section.

Section 33–1–3 which was enacted as part of the same act in 1939 as Section 33–1–1 provides in relevant part:

> The provisions of this act are supplemental to *any and all other laws* relating to and declaring what shall be *legal investments* for the persons, corporations, organizations and officials referred to in this act . . . . (emphasis added)

---

2. The State Legislature has taken an interest in investments by state agencies and regulated "industries".
Utah State Retirement Board, UCA 49–9–12
Fiduciaries, UCA 7–5–11

Insurance Companies, UCA 31–13–1 et seq.
Department of Finance, UCA 63–2–34
State Land Board, UCA 65–1–65 (present statute)

■ Section 33–1–1 is simply a declaration that investments in specified securities are lawful. Without prohibiting any other investments or requiring only the listed investments, the Legislature declared that certain investments were lawful. It is apparent that in enacting Section 33–1–3 the Legislature envisioned situations where the "named parties" mentioned in Section 33–1–1 might be empowered to invest in securities of a type not enumerated in Section 33–1–1.[3] Further, the language of Section 33–1–3 quoted above was worded to include within its meaning any laws which the Legislature might enact thereafter. Subsequent to the enactment of Section 33–1–3, the Legislature has enacted statutory definitions of what are legal investments for some state agencies and regulated "industries".[4] However, no other statute enacted prior or subsequent to 1939 defines specifically what type of securities USU may legally invest in. It must be concluded, therefore, that USU had no specific designated power from the Constitution or the Legislature to invest its funds in securities outside those declared lawful by 33–1–1 and investments in common stock are ultra vires acts.

What, then, is the effect of an ultra vires contract by a public corporation?

In *News Advocate Publishing Co. v. Carbon County*, 72 Utah 88, 269 P. 129 (1928), the Carbon County Clerk caused to be published in plaintiff newspaper a Notice of Sale of Property on which taxes were delinquent. Defendant County, on receiving the publication bill, refused payment on the basis that the contract was ultra vires because the County Commissioners had no statutory power to authorize such a publication as the one therein involved. Therein this Court said:

The general principle or rule of law that municipal corporations are not bound by contracts made without authority or in excess of the power of such corporations is conceded. The rule applicable is stated in 15 C.J. 540 as follows:

"A County is not bound by a contract beyond the scope of its power or foreign to its purposes, or which is outside of the authority of the officers making it. In this connection it is the rule that the authority of a county board to make contracts is strictly limited to that conferred, either expressly or impliedly, by statute, regardless of benefit to the county or of value received; and the same is true as to other county officers attempting to contract on behalf of the county. * * * All persons dealing with officers or agents of counties are bound to ascertain the limits of their authority or power as fixed by statutory or organic law, and are chargeable with knowledge of such limits. No estoppel can be created by the acts of such agents or officers in excess of their statutory or constitutional powers."

For further authority for the proposition that "one who deals with a municipal corporation does so at his peril" see *Thatcher Chemical Co. v. Salt Lake City Corporation*, 21 Utah 2d 355, 455 P.2d 769 (1968) and cases cited therein.

If the enforcement of this rule at times appears harsh, it is a matter for the State Legislature to correct.

■ Although this action was commenced and argued at the lower Court on the basis of breach of contract between the parties, plaintiff and Amici now contend that in any event plaintiff should be entitled to recover because they were acting as the agents of USU.[5] Under the theory of agency, one of two things would occur;

---

3. In 1939 when Sections 33–1–1 and 33–1–3 were enacted, the State Land Board already possessed statutory power to invest its funds in securities not enumerated in Section 33–1–1, e. g., "state, county, city or school district bonds".

4. See Footnote 2 above.

5. Ordinarily, an appellant cannot raise a theory on appeal for the first time different from that presented to the Court below. *Davis v. Mulholland*, 25 Utah 2d 56, 475 P.2d 834 (1970).

either the loss would have to be absorbed by the seller of the stocks who doesn't have the faintest idea that his stock is being purchased by a public corporation or the rules denying recovery on ultra vires contracts of a public corporation would be meaningless. Substantive rights involving public funds should not be determined by the custom of the securities industry in designating the broker as the agent of the buyer or as agent of the buyer and seller. The rules denying recovery of an ultra vires contract are based on the theory that the party actually dealing with the public entity is charged with the knowledge that the contract is ultra vires and unenforceable, and in this case the plaintiff is the party actually dealing with the public entity and this action was filed on that basis—that USU was a customer of First Equity.

█ USU had no power to enter into an agreement for the purchase of common stock and the agreement to purchase and pay commissions thereon are ultra vires agreements and unenforceable.

The Trial Court's granting of Summary Judgment to USU is affirmed.

No costs awarded.

HENRIOD, C. J., and ELLETT, CROCKETT, and TUCKETT, JJ., concur.

MAUGHAN, J., does not participate herein.