BREITLING BROTHERS CONSTRUCTION, INC., Plaintiff and Respondent,

v.

UTAH GOLDEN SPIKERS, INC., and the State of Utah, Defendants and Appellant.

No. 15945.

Supreme Court of Utah.

June 21, 1979.

Robert B. Hansen, Atty. Gen., William G. Gibbs, Special Asst. Atty. Gen., Salt Lake City, for defendants and appellant.

Mark C. McLachlan, Salt Lake City, for plaintiff and respondent.

CROCKETT, Chief Justice:

Plaintiff brought this action against the Utah Golden Spikers, Inc., and the State of Utah to recover the value of labor and material furnished in connection with the removal of the race track and the installation of a soccer field in front of the grandstand at the state fairgrounds.

Judgment by default was entered against the Golden Spikers and after trial to the court, the state of Utah was found liable to the plaintiff pursuant to the provisions of Section 14–1–7, U.C.A.1953, and in quantum meruit.

During March 1976, representatives from the Golden Spikers, a National Soccer League franchise, began negotiations with the state concerning the leasing of the grandstand at the state fairgrounds for use in exhibiting soccer games. These negotiations were carried on for the state primarily by Milton L. Weilenmann, the Executive Director of the Department of Services, and Hugh C. Bringhurst, Director of the Expositions.

In the latter part of March, a proposed agreement concerning the leasing of the fairgrounds by the state to the Golden Spikers was drafted by William C. Gibbs, a member of the Utah Attorney General's office. The proposed lease agreement was prepared so as to require the signatures of the State Director of Finance, the State Budget Officer, Mr. Bringhurst, Mr. Weilenmann and an executive officer of the Golden Spikers.

This agreement was never signed by the officers indicated to be signators thereon. It was signed only by Mr. Weilenmann and Mr. Bringhurst, and no one signed it for Golden Spikers.

Notwithstanding the lack of an executed lease agreement, the Golden Spikers contracted with Weyher Construction Company on March 31, 1976, to demolish the race track and install a soccer field. Weyher, without the knowledge or permission of any state authorities, began removing the race track. Upon becoming aware of the construction, Mr. Bringhurst ordered Weyher to cease operations pending directions from Mr. Weilenmann. After consulting with Mr. Gibbs, Mr. Weilenmann relayed the information that the construction activities could proceed under an assumption that a written agreement could be concluded between the state and the Golden Spikers. However, for reasons not disclosed by the record and of no concern here, Weyher moved off the job. Shortly thereafter, during the first part of April 1976, Golden Spikers engaged plaintiff Breitling Brothers to complete the job of removing the race track, preparing the soccer field and surfacing a parking area.

On May 8, 1976, plaintiff completed the project and thereafter several soccer games were played. Lease agreement negotiations between the state and Golden Spikers continued through the 1976 soccer season. However, a written agreement was never finalized nor executed; and the trial court so found. The Golden Spikers went broke and the principals left the state without paying the plaintiff.

■ Plaintiff first argues that under Section 14–1–5, U.C.A.1953, the state was required to obtain a payment bond from the Golden Spikers which would assure that any laborers and materialmen engaged by them would be paid. That section provides that *"before any contract* for the construction . . . of any . . . improvements for the state of Utah . . . *is awarded* to any person, he shall furnish to the state . . . bonds . . ." *for the purpose* just stated. Coordinate with this is Sec. 14–1–7 which provides that:

> Any public body subject to this act which shall fail or neglect to obtain the delivery of the payment bond as required by this act shall upon demand, itself promptly make payment . . .

The important point to note is that the prerequisite to invoking the requirement of those statutes is that a contract must be awarded.

Plaintiff argues that even though there was no formal contract executed, under the circumstances shown there should be deemed to exist an oral contract, or one implied in fact, by which the state should be obligated to pay for the soccer field project, and that upon the predicate of such a contract, the state should have obtained the bond from the contractor as required by Sec. 14–1–5 referred to above, and having failed to do so should be held liable by reason of Sec. 14–1–7 quoted above. The inquiry then becomes whether any such contract could be found to exist.

■ We agree with the averment of the plaintiff that the state should be bound by the same standards of honesty and fair dealing as anyone else.[1] The reverse is also true: that persons dealing with the state should not over-reach to impose obligations thereon except in conformity with the requirements of the law. For a contract to be "awarded" by the state, or other public institution, it must be entered into as a result of a decision by the governing board or other authority charged with that responsibility.[2] In order that this may be accomplished and that the public interest may be properly safeguarded, Sec. 64–1–4, U.C.A.1953, provides that:

> Whenever the needs of a state institution . . . require . . . any work amounting to more than $1000 to be done, the governing board of such institution . . . shall advertise for at lease 10 days in some newspaper . . . for sealed proposals for repairing or erecting such building, or performing such work, in accordance with plans and specifications to be had at the office of the board.

■ There appear to be several reasons why the legislature has deemed it proper to enact statutes of this character. One of these is that the business of the public must be taken care of by a succession of changing elected public officials, who have no personal interest at stake except their sense of duty; and that it is well known that they are subjected to many types of pressures and importunities from persons who would use various means of attempting to profit from the public treasury. The requirement of public notice by advertising, and the acceptance of bids, serves to protect the public interest and taxpayers from any dealings in secrecy, or from officials showing favoritism or engaging in collusion with friends or political supporters, and from any ill considered, unnecessary, or extortionate contracts.[3] If the required procedures are not adhered to, the salutary purpose of the statute could be defeated by simply allowing parties to furnish materials or render services to the state, and then recover on the basis of estoppel or quantum meruit. It is for these reasons that it is quite universally held that in order to bind the state, the requirements of the statute must be complied with; and that the usual rules of estoppel do not apply against it.[4]

In conformity with what has just been stated, we can see no basis whatsoever upon which to agree with plaintiff's contention that it should be deemed that there was a contract with the state of Utah by which it was obliged to require Golden Spikers to furnish a bond to guarantee payment of laborers and materialmen, as required by Sec. 14–1–5, U.C.A.1953.

1. *Rice v. Granite School District*, 23 Utah 2d 22, 456 P.2d 159 (1969).

2. *Jackson v. State*, 194 Ind. 130, 142 N.E. 1 (1924).

3. See *Tobin v. Town Council of City of Sundance*, 45 Wyo. 219, 17 P.2d 666 (1933), citing 3 McQuillin, Municipal Corporations, Section 1266 (2d Ed.).

4. *Carolina National Bank v. State*, 60 S.C. 465, 38 S.E. 629 (1901).

 The other basis upon which plaintiff contends that the state should compensate it is on a theory of quantum meruit. The gravamen thereof is that one should be required to pay for benefits he has accepted.[5] Notwithstanding what has been said above, we have no doubt that under some exigent circumstances, if a third party had *so contracted, and had constructed something* which was an actual benefit to the state, so that it would be unjust for the state and its taxpayers to have that benefit without paying for it, in equity and good conscience the state should be required to do so. In that connection it is important to observe that it was and is the position of the state that it has not been unjustly enriched, but on the contrary, has actually suffered a loss because of the destruction of the race track and the installation of the soccer field which is not being used.

In regard to the question of unjust enrichment, a careful analysis of this record and of the findings of the trial court fails to indicate that there was a trial and resolution of that issue. We so state advisedly even though the conclusions of law include the statement that the state has been "*unjustly enriched* with the labors and materials supplied by the plaintiff," yet fails to state any amount thereof. The significant fact is that the recital of the award of damages does not relate to any finding of unjust enrichment, but states that the sum awarded "represents the reasonable value of the labor and materials supplied by the plaintiff" in connection with the improvements at the state fairgrounds as $11,874.49.

Turning attention to the plaintiff's side of the unjust enrichment question, when the attempt was made to pursue that matter on its behalf, the following dialogue took place:

PLAINTIFF'S COUNSEL: Your Honor, the reason I am getting into this is, I think the law says that if we are successful *on a theory of unjust enrichment, we have to show the State has received a benefit* from the work performed. The reason I am getting into this is to show the race track was removed and has been of benefit to the State.

THE COURT: *You can't say it is a benefit to the State.* We have to use the facility there for use, I guess. *The fact that the race track is destroyed* and something else put there, *doesn't necessarily mean that that is beneficial to the State.* I don't think that is necessarily relevant and material here. Have this witness testify that had the race track been in, the Buckaroos would have had to remove it before they used it, I don't think is relevant and material here. [All emphasis herein added.]

It thus appears that the plaintiff was in effect dissuaded from its attempt to show that there had been an unjust enrichment to the state.

We are sensitive of the undesirability of protracting litigation; and also of the fact that when there has been a trial of a dispute and both parties have had an opportunity to present their evidence, the issues should be resolved and the matter settled. But there is a consideration of even higher priority: that is, that when a controversy exists, the essential issues should be resolved so that justice can be done. Correlated to this is the rule that a finding should be made on all material issues in dispute which are essential to the accomplishment of that purpose.[6] Inasmuch as there has been no such resolution nor finding made upon what we regard as an essential issue: whether the state has in fact been unjustly enriched by the project carried out by the plaintiff, it is necessary that this case be remanded for such proceedings as the district court may deem appropriate for the determination of that issue, and for the entry of such judgment thereon as the interests of justice may require. It is so ordered. No costs awarded.

MAUGHAN, WILKINS, HALL, and STEWART, JJ., concur.

---

5. 98 C.J.S. Work and Labor § 6.

6. *Gaddis Investment Company v. Morrison,* 3 Utah 43, 278 P.2d 284 (1954).