UTAH STATE UNIVERSITY OF AGRI-
CULTURE AND APPLIED SCIENCE, a
Utah body politic and corporate, Plain-
tiff and Respondent,

v.

SUTRO & CO.; Bear Stearns & Co.;
Hornblower & Weeks-Hemphill, Hoyes,
Inc.; Merrill Lynch, Pierce, Fenner &
Smith; Bosworth, Sullivan & Co.; and
Shearson, Hammill & Co., Defendants,
Third-Party Plaintiffs and Appellants,

v.

Phillip A. BULLEN, et al.,
Third-Party Defendants.

Nos. 16274–16279, 16285–16292
and 16294–16297.

Supreme Court of Utah.

May 5, 1982.

Harold G. Christensen, R. Brent Stephens, Dee V. Benson, Salt Lake City, for Bosworth.

Keith E. Taylor, Daniel M. Allred, Kathlene W. Lowe, Salt Lake City, for Sutro.

David L. Wilkinson, Atty. Gen., Salt Lake City, for USU, plaintiff and respondent.

Robert S. Campbell, Jr., H. Wayne Wadsworth, Michael F. Heyrend, Salt Lake City, John W. Morrison, David R. Melton, Chicago, Ill., Lyle W. Hillyard, Logan, Darwin Hansen, Bountiful, for third-party defendants.

CROCKETT, Retired Justice:

These actions were brought on behalf of Utah State University of Agriculture and Applied Science (herein referred to as USU) against the five named defendants, who are brokers and dealers in stocks and securities (herein referred to as the brokers), to recover losses sustained by USU as a result of a program of investments carried on through the brokers between September, 1970, and March, 1973. The brokers denied liability, filed counterclaims and also filed third-party claims against the named USU officials and members of the USU Institutional Council (herein referred to as the Council members) seeking indemnity for any losses that may be assessed against the brokers.

Pursuant to motions, the trial court entered the following orders: denied defendants' motions to dismiss; granted USU's motion for partial summary judgment against defendant brokers, ruling that they are liable as a matter of law; and dismissed the defendants' counterclaims and their third-party actions against the Institutional Council members. This Court granted the brokers' petitions for intermediate appeal, in which these actions are combined.

■ In view of the fact that the rulings under attack were made by the trial court as a matter of law, without giving the brokers an opportunity to present evidence and have findings of fact made thereon, for the purpose of this review we accept their assertions as true,[1] but we expressly note that in our exposition of facts in that light we do not desire to indicate any view as to how the disputed issues of fact may be resolved upon a trial thereof.

Motivated by a desire to better manage USU's financial resources, in the summer of 1970 its Institutional Council decided upon and launched what is referred to as an "aggressive program" of investing in stocks, which led to opening accounts with the defendant brokers. It adopted resolutions authorizing dealings in stocks and securities by its vice-president, Dee A. Broadbent, and Donald A. Catron, controller. The brokers aver that it was at the request of these USU officials that they engaged in dealing in the stocks.

■ It is not to be questioned that the defendants, who are licensed to render service as brokers, must be deemed to have and use specialized knowledge, experience and integrity in rendering that service; and more specifically here, that they have an especially high degree of care to ascertain the authority of a trustee (plaintiff) dealing with public funds. Upon trial, there will be an issue as to what those standards are, and the extent to which the brokers discharged the high responsibilities which the law imposes upon them. The brokers contend that they discharged their duties in accordance with the standards of their business, in ascertaining the authority of USU to so invest its funds; that they requested and received the resolutions of the Council indicating such authority; that they acted in good faith upon the resolutions and assurances given to them as to the University's authority to invest its funds for its potential benefit; and that they did nothing other than "to scrupulously, fairly, and diligently carry out instructions given them" by the Council and its agents authorized for that purpose; and that in the hundreds of

1. *Hatch v. Sugarhouse Finance Co.*, 20 Utah 2d 156, 434 P.2d 758 (1967).

transactions over a period of 3 years they acted only as conduits, transferring the stocks from various principals to USU and vice versa, and only in relatively few instances were themselves principals, selling the stocks to USU.

During the first two years, while the stock market was rising, the investment program prospered and everyone concerned seemed to be happy about the situation. However, in the fall of 1972 there was a recession in the stock market and there were substantial declines in values of stocks owned by the University. In late November, 1972, during the course of an independent audit, the Attorney General was requested for an opinion as to the legality of the investments. On December 15, 1972, he issued an opinion that it was not lawful for the University to invest state funds in securities not expressly authorized in Sec. 33–1–1, U.C.A. 1953, which does not include common stocks. Acting thereon, at its next meeting in January, 1973, the Board of Higher Education instructed the USU Council by letter to liquidate all securities not expressly authorized by that statute. However, it appears that Mr. Catron did not fully comply with that mandate immediately; and that information was not officially transmitted to the brokers until March of 1973.

As a result of the losses incurred in the liquidation process, these suits were brought against the defendant brokers seeking to recoup losses running into millions of dollars on the ground that their contracts with the University had been illegal and void.

Principal among the issues raised by the brokers is their contention that the trial court erred in ruling that they could not assert estoppel against USU, a governmental institution, and that they are liable for its losses as a matter of law. They argue that this results in a grave injustice to them procedurally: it allows plaintiff USU to repudiate its representations made to them; to have the advantage of their services without compensation; to accept the benefits of the investment program and disavow the losses; then to arbitrarily impose the losses on defendant brokers; all this without giving the brokers any opportunity to prove their contentions. The brokers essay the position that their evidence will convince any fairminded trier of facts that to apply the rule that estoppel does not apply against the government would result in such obvious and serious injustice as to bring this case within the well-recognized exception to that general rule.

We have no doubt about the soundness nor the salutary purpose of the rule that estoppel generally is not assertable against the government or governmental institutions.[2] There are good and sufficient reasons for that rule, including the safeguarding of the interests of the public, which are often somewhat in hazard because of the vagaries of political tides, frequent changes of public officials, the possibility of collusion, or of circumventing procedures set up by law, then suing for the value of goods furnished or services rendered. Notwithstanding our approval of that rule, like most general rules, there are exceptions when its rigid application would defeat, rather than serve, the higher purpose that all rules are intended to serve: that of doing justice.[3] The rule is therefore applied when it will serve that purpose. But in unusual circumstances, when it is plainly apparent that its application would result in injustice, and there would be no substantial adverse effect on public policy, the courts will honor the higher purpose of doing justice by invoking the exception, rather than departing from that desired objective in slavish adherence to a general rule.[4]

---

2. *Breitling Bros. v. Utah Golden Spikers, Inc.,* Utah, 597 P.2d 869 (1979).

3. Cf. Lord Mansfield's dictum: Let justice be done, though the heavens fall.

4. That courts are increasingly applying this exception, consistent with the trend toward holding government and its agencies more responsible for their actions. See Davis, Administrative Law of the Seventies, § 17.01, and cases therein cited; Berger, Estoppel Against the Government, 21 U.Chi.L.Rev. 680, 686 (1954);

In addressing the question whether under any state of facts that may be found in this case the defense of estoppel may be applied, there are some observations to be made. The first is that there is a distinction to be drawn between contracts or activities which are either malum in se, or which are strictly prohibited by statute, and thus may be strongly against public policy, as compared to activities such as those of concern here which, though not authorized by law, are not inherently evil. In the former class of cases, it is quite universally held that no estoppel will lie against the government, whereas in activities which are merely ultra vires the courts are more likely to allow such a defense; and this is also true of situations when the governmental entity engages in proprietary or business activities.[5] In this case, the activities with which we are concerned were business activities. That activities such as those in question here were ultra vires has been adjudged in our case of *First Equity Corp. v. Utah State University*,[6] but the plaintiff's reliance on that case as squarely supporting its position here is misplaced. The holding there was that because the contract was ultra vires the broker could not enforce it, quite different from the situation confronted in this case.

Further pursuing the inquiry as to whether these contracts between plaintiff USU and the defendant brokers should be regarded as utterly illegal and void, as compared to being simply not authorized by law, it seems helpful to figuratively "try the shoe on the other foot." Suppose in an instance where a broker had made a substantial stock purchase at USU's request and held it for a few months, there had been an increase in value with a profit of say $100,000, and that the broker had refus-

ed to remit and defended on the ground that the contract was completely void. The rejection of that contention seems so obviously just as to hardly require stating.

A decision which recognized that there are sometimes circumstances where the interests of justice demand allowing the doctrine of estoppel to be asserted against the government was issued over 100 years ago by the United States Supreme Court in *Hackett v. City of Ottawa*.[7] There the city officials had represented that bonds were issued for a lawful purpose and issued them under the city's seal, but it was later determined that their issuance had not been in accordance with lawful authority. It was held that because such obvious unfairness would otherwise result to purchasers of the bonds, the city was estopped from asserting that they had been unlawfully issued and were void.

Another case which we regard as helpful and representing sound reasoning on this subject is that of *United States v. Lazy FC Ranch*.[8] After reviewing the case law, the court stated that estoppel should be allowed as a defense against the government where to do otherwise would work a serious injustice, and the public interest would not be unduly damaged by the interposition of that defense. In its discussion, the court engaged in what has been referred to as a "balancing of equities" test and concluded that under the facts of that case a grave injustice would result if the government were not held responsible for the information it had given the Ranch and which the latter had relied on; and that under the circumstances there would be no serious adverse effect either on public policy or the interest of the government by permitting the Ranch partners to retain the funds they had received.

Newman, Should Official Advice Be Reliable?—Proposals as to Estoppel and Related Doctrines in Administrative Law, 53 Colum.L.Rev. 374 (1953). A recent decision of this Court indicating agreement with the trend toward narrowing governmental protection is *Standiford v. Salt Lake City*, Utah, 605 P.2d 1230 (1980).

5. *Nestman v. South Davis County Water Improvement Dist.*, 16 Utah 2d 198, 201, 398 P.2d

203, 205 (1965). Accord, *Gordon v. Provo City*, 15 Utah 2d 287, 288–89, 391 P.2d 430 (1964).

6. Utah, 544 P.2d 887 (1975).

7. 99 U.S. 86, 25 L.Ed. 363 (1878).

8. 481 F.2d 985 (1973).

In the later case of *United States v. Wharton,*[9] the court reiterated the standard set forth in Lazy FC Ranch. The defendants asserted the government was estopped by the affirmative misconduct on the part of government officials who gave them incorrect information. The court noted the precaution that not every form of official misinformation would be sufficient to estop the government, but where advice given was so closely related to basic fairness and the decision-making process, the government should be estopped from disavowing the representation made because to do so would work a serious injustice on the defendant and the interest of the public would not be unduly threatened or damaged.

Our own Court has similarly long since taken its position in accord with the doctrine just discussed, of looking through the rigidity of a general rule to see and apply an exception where it is plain that the interests of justice so require. In the case of *Wall v. Salt Lake City,*[10] the city by affirmative acts and representations had allowed the plaintiffs to take possession of property which was difficult for the city to utilize as a street. In reliance thereon, the plaintiffs had possessed and cared for the property for over 20 years. The Court held that the city was estopped from repudiating its representations and reclaiming the property. The ruling in the Wall case was restated with approval in the later case of *Tooele City v. Elkington,*[11] though the Court was not persuaded that the factual requirements for invoking estoppel against the city were met.

We have recently had occasion to confront another situation where egregious injury would result unless estoppel was applied against a governmental institution. In *Celebrity Club v. Utah Liquor Control Commission,*[12] the plaintiff club had made large expenditures, relying on assurances of an official of the Liquor Commission, which this Court held could not be repudiated to the injury of the club.

We regard the authorities referred to above as well reasoned, with which our sense of justice is in harmony, and supportive of the well-recognized policy of the law as earlier set forth herein, to the effect that the rule which precludes the assertion of estoppel against the government is sound and generally should be applied, except only in appropriate circumstances as hereinabove stated, where the interests of justice mandate an exception to that general rule.[13] In cases where such an issue arises, the critical inquiry is whether it appears that the facts may be found with such certainty, and the injustice to be suffered is of sufficient gravity, to invoke the exception. And in case there is doubt on such matters, it should be resolved in favor of permitting the party to have a trial of the issue, as opposed to summary rejection thereof.[14] Whether injustice of that serious character would be the result in this case can only be determined on the facts which may be found from the evidence to be presented on the issues in dispute.

Taking the brokers' averments and representations as true, we cannot conclude with assurance that there is no reasonable probability that they can meet the test stated herein. It is therefore our conclusion that it was improper to adjudge them liable as a

---

**9.** 514 F.2d 406 (1975).

**10.** 50 Utah 593, 168 P. 766 (1917).

**11.** 100 Utah 485, 116 P.2d 406 (1941).

**12.** 602 P.2d 689 (1979).

**13.** Any apprehension about adverse effects on the public interest of recognizing the defense of estoppel is minimized here because after the public notoriety concerning the controversy here involved, our state legislature more clearly delineated the power of the University to invest

in securities. See § 51–7–1, et seq., U.C.A., 1974 Supp.

**14.** Sec. 11, Art. I, Utah Const. assures access to the courts for the protection of rights and the redress of wrongs; therefore, summary judgment, which denies the opportunity of trial, should be granted only when it clearly appears that there is no reasonable probability the party moved against could prevail. See *Reliable Furniture Co. v. Fidelity and Guar. Ins. Under.,* 16 Utah 2d 211, 398 P.2d 685 (1965), and authorities therein cited.

matter of law. In relation to the issues raised in this case, it is deemed desirable and necessary that an opportunity be afforded the defendant brokers and the plaintiff USU to present such evidence as they desire in support of their respective contentions as to the propriety of their conduct, and that a trier of facts make a determination thereon.

The second issue of major importance is the defendant brokers' attack on the trial court's dismissal of their third-party complaints for indemnification from members of the Institutional Council for any damages that may be assessed against the brokers. We first note that the brokers state in their brief that they are not appealing from the dismissal of their third-party actions against the Institutional Council as an entity, but appeal only the dismissal as to the individuals involved.

The proposition upon which the brokers base their third-party complaints is that if an agent (themselves) is held liable for actions in which he is innocent, and which his principal (USU) directed him to commit, the principal must reimburse the agent for the damages incurred.[15] Their averments are that the Council members were all well educated, experienced and sophisticated in such matters; that as trustees of a public trust they were charged with knowledge as to the extent of their authority and with a high degree of responsibility in discharging their duties; and that in case of any uncertainty they had ready and free access to the advice of the Attorney General; but that they nevertheless negligently failed in their duty and made the representations hereinabove set forth to the broker-dealers, who aver that they were innocent agents in the transactions. This position might have merit if they had not been dealing with a governmental institution and public officials.

The generally recognized doctrine of law is that public officials are protected by a qualified immunity from suits growing out of the performance of lawfully authorized discretionary duties, so long as they are acting in good faith and are not guilty of any willful or intentional wrongdoing.[16] The underlying reasons for this are that such protection is in accord with the interests of justice; is necessary as a matter of public policy in order not to deter persons of capability and integrity from accepting the responsibilities of public office; and that when they are so serving they should be free to exercise their judgment without fear of damage suits because someone thinks they made a mistake in judgment. Whenever confronted by such an issue, this Court has consistently aligned itself with the doctrine just stated and has ruled that when a public official is so acting in good faith in performing his discretionary duties he is not liable in damages simply because he may make a mistake in judgment.[17]

The defendant brokers do not allege that the Council members acted in bad faith, nor that they committed any willful or intentional wrong. This is advisedly so because it is plainly apparent that there would be no basis for support on any such charge. In spite of errors in judgment, now so plainly revealed by hindsight, no one questions that the Council members acted in accordance with their then best judgment for the benefit of the institution they served, with little other advantage to themselves than the satisfaction of having rendered a worthwhile public service.

On the basis of what has been stated above, it is our conclusion that the trial court was justified in dismissing the de-

---

15. Citing *Hoggan v. Cahoon*, 26 Utah 444, 73 P. 512 (1903).

16. See, e.g., *Barr v. Matteo*, 360 U.S. 564, 575, 79 S.Ct. 1335, 1341, 3 L.Ed.2d 1434 (1959); *Smith v. Losee*, 485 F.2d 334, at 343–344 (1973). Eminent authorities in accord, Prosser, The Law of Torts, § 132; 4 McQuillan, Municipal Corporations, § 12.208.

17. *Anderson v. Granite School District*, 17 Utah 2d 405, 413 P.2d 597 (1966); *Hjorth v. Whittenburg*, 121 Utah 324, 241 P.2d 907 (1952); *Sheffield v. Turner*, 21 Utah 2d 314, 445 P.2d 367 (1968).

fendant brokers' third-party complaints against the University officials and Council members; and that ruling is affirmed.

The nonresident brokers (except Merrill Lynch, which has an office in Salt Lake City) also contend that no personal jurisdiction was acquired over them. There are a number of significant facts to be noted which have a bearing on that question. The brokers advertise in the public media soliciting business here; they conversed regularly with Mr. Catron, either calling him or accepting his collect calls about the stock transactions. Two banks in Logan were authorized to receive the stock certificates sent by the brokers, to be exchanged for the proceeds of drafts payable to the brokers. Upon the purchase of stocks ordered by the plaintiff, the broker would send a confirmation of purchase slip, and monthly would send a statement of account.

There is a fallacy in the brokers' argument in that they assume that because the banks that handled the plaintiff's funds and were designated by it to receive the stock certificates and pay drafts therefor, the banks were exclusively the agents of the plaintiff. It is not necessarily always true that a party acting as an agent in a transaction must be exclusively the agent of one party or the other. When he is requested and performs duties for each of the parties, with the knowledge and consent of both, he may very well be considered as an agent for each for the particular services he renders that principal.[18] Insofar as the Logan banks performed duties for and by direction of the defendant brokers, they were acting as the brokers' agents. That being so, there is ample justification for the trial court's holding that they conducted substantial and continuous activities in this state sufficient to subject them to the jurisdiction of its court.[19]

Two of the defendants, Merrill Lynch and Bosworth-Sullivan, also contend that the trial court erred in denying their motions for change of venue from Cache County to Salt Lake County. Their position is that that is where the alleged causes of action arose because that is where they accepted the orders and executed the purchases of stock for plaintiff. However, we see no reason to disagree with the view adopted by the trial court that the transactions were actually consummated in the delivery of the stock and the payment therefor in the Logan banks; that this constituted the alleged wrongful acts; and that consequently the venue of the action was properly laid in Cache County. Moreover, assume that there may be some merit to these defendants' argument that venue should properly have been laid in Salt Lake County. When venue may properly lie in more than one county, the trial court has considerable latitude of discretion in acting on a motion for change; and his ruling will not be disturbed in the absence of a clear abuse thereof.[20] We are not persuaded that there was any error or abuse of discretion in denying defendants' motions.

Other issues raised have been considered and are deemed to be without sufficient merit to warrant discussion. This case is remanded for further proceedings in conformity with the views expressed in this decision. No costs awarded.

HALL, C. J., STEWART and HOWE, JJ., and GEORGE E. BALLIF, District Judge, concur.

OAKS and DURHAM, JJ., do not participate herein.

---

18. See *Foster v. Blake Heights Corp.*, Utah, 530 P.2d 815 (1974), and authorities therein cited; 3 Am.Jur.2d Agency, § 234 (1962).

19. *Burt Drilling, Inc. v. Portadrill*, Utah, 608 P.2d 244; *Brown v. Carness Corp.*, 611 P.2d 378; *Roskelley & Co. v. Lerco, Inc.*, Utah, 610 P.2d 1307.

20. *Chamblee v. Stocks*, 9 Utah 2d 342, 344 P.2d 980 (1959).