2011 UT App 190

**Kevin A. McLEOD, Petitioner,**

**v.**

**RETIREMENT BOARD, Respondent.**

**No. 20100026–CA.**

Court of Appeals of Utah.

June 16, 2011.

Brandon R. Richards and Reed M. Richards, Ogden, for Petitioner.

David B. Hansen and Liza J. Eves, Salt Lake City, for Respondent.

Before Judges THORNE, VOROS, and ROTH.

## OPINION

VOROS, Judge:

¶ 1 Kevin A. McLeod seeks review of a Utah State Retirement Board (the Board) ruling that his retirement benefits from two periods of public employment must be calculated separately. We affirm.

## BACKGROUND

¶ 2 From 1976 to 1996, McLeod worked in law enforcement for the Clinton and Bountiful City Police Departments and the Davis County Sheriff's Office (Davis County), accruing just over twenty years of service credit in the Public Safety Noncontributory Retirement System.[1] In 1996, McLeod was offered a position at Browning Arms Company, a private employer. Around the same time, McLeod's supervisor at Davis County, Bud Cox, decided that he would run for sheriff of Davis County in 1998. Cox told McLeod that, if elected, he would like to hire McLeod as chief deputy—a higher-paying position than the one McLeod then held.

¶ 3 McLeod was interested in both the Browning position and the chief deputy position. His solution was to retire from Davis County, work for Browning, then return to Davis County as chief deputy if Cox did get elected. However, McLeod was concerned about the effect on his retirement benefit if he retired from Davis County, began receiving retirement benefits, then returned to Davis County. McLeod testified that he made three telephone calls to the Utah Retirement Systems Office (URS) in 1996, spoke to an unidentified representative, and "asked very detailed questions" about the impact on his retirement benefit if he retired and then was rehired. McLeod testified that he was told on every occasion "that if he retired and left for two years, then returned to Davis County, and canceled his retirement, when he finally retired[, his retirement] benefit would be calculated using one continuous period of time." McLeod maintains that he would not have retired from Davis County in 1996 had he not been told that his final retirement benefit would be calculated as one continuous period of service.

¶ 4 Neither McLeod nor URS has any record of these phone calls. Moreover, according to URS policy, in 1996, telephone questions regarding post-retirement benefit

---

1. All of these employers, as governmental entities, participate in the retirement programs of the Utah State Retirement Systems. *See* Utah Code Ann. §§ 49–11–101 to –20–410 (2010).

calculation would have been referred to a post-retirement specialist, typically Judy Lund, the Director of the Retirement Department. Lund testified that neither she nor any other URS employee would have told McLeod what he remembers being told. And despite deposing both current and former URS employees, McLeod has found no support for his version of the phone conversations.

¶ 5 In any event, in reliance upon his understanding of the phone calls, McLeod retired from Davis County in December 1996, began receiving retirement benefits, and went to work for Browning. About two years later, Cox was elected sheriff and McLeod returned to work at Davis County as chief deputy. During the two-year hiatus, McLeod received approximately $50,000 in retirement benefits. Upon his re-employment with Davis County, McLeod's retirement benefit was terminated pursuant to Utah Code section 49–1–505(1)(a)(ii), *see* Utah Code Ann. § 49–1–505(1)(a)(ii) (1998), and he began accruing service toward a new benefit. In March 2001, McLeod contacted URS regarding his retirement and understood for the first time that his benefit would not be calculated as one continuous period of service but rather as two distinct periods. He retired again in 2007 after approximately eight years as Davis County Chief Deputy and began receiving retirement benefits based on two periods of service—1979 to 1996 and 1999 to 2007.

¶ 6 Treating McLeod's public service as a twenty-year period followed by an eight-year period rather than a single twenty-eight-year period substantially affects the amount of his retirement benefit. Generally, URS calculates the retirement benefit of a retiree of Utah's Public Safety Noncontributory Retirement system by multiplying the employee's retirement rate times years of service times the final average monthly salary. *See id.* § 49–4a–402. The retirement rate is 2.5% for the employee's first twenty years and 2.0% for the employee's next twenty years. *See id.* § 49–4a–402(1). The retiree's final average monthly salary is calculated using the highest three years of income preceding retirement. *See id.* § 49–4a–103(2).

¶ 7 Consequently, an employee's salary during the three highest income-earning years—generally the three years immediately preceding retirement—greatly affects the retirement allowance. McLeod's highest average annual salary from his first period of service is approximately $50,000. His highest average annual salary from his second period of service is approximately $85,000. URS used the lower figure to calculate McLeod's retirement allowance for his twenty years of service concluding in 1996 and the higher figure for his eight years of service concluding in 2007. By contrast, using the higher figure and treating the two stints as one continuous period of service would increase McLeod's annual retirement benefit by approximately $24,000.

¶ 8 McLeod petitioned URS to have his retirement calculation based on a single twenty-eight-year period of service. URS denied this request and McLeod appealed to the Board. Following a formal hearing before an adjudicative officer, the Board affirmed the denial. The Board ruled that URS had correctly calculated McLeod's benefits under prevailing law. In addition, the Board found that McLeod "failed to provide any verifiable evidence, such as a document or a recording, of the substance of any conversations with URS in 1996."

## ISSUES AND STANDARDS OF REVIEW

¶ 9 McLeod contends that the Board misinterpreted Utah Code section § 49–1–505 and thus erred by calculating his benefit based on two distinct periods of service. "[W]e review the Board's application or interpretation of a statute as a question of law under the correction-of-error standard." *Whitaker v. Utah State Retirement Bd.*, 2008 UT App 282, ¶ 10, 191 P.3d 814 (internal quotation marks omitted).

¶ 10 McLeod also contends that, even if the Board's reading of the statutory scheme is correct, the Board is nevertheless equitably estopped from calculating his retirement benefit other than as a single continuous period of service. "This claim presents a mixed question, which involves the application of law to fact. We review the

underlying facts for clear error and the application of the law to those facts for correctness." *Id.* ¶ 11 (citations and internal quotation marks omitted).

## ANALYSIS

### I. Statutory Interpretation

¶ 11 McLeod contends that the Board erred when it interpreted section 49–1–505 of the Utah State Retirement Act to require that his two periods of service be treated separately in calculating his retirement allowance. *See* Utah Code Ann. § 49–1–505 (1998). McLeod argues that the Board should instead have calculated his retirement allowance based on "one continuous period." The Board counters that section 49–1–505 "unambiguously requires URS to calculate McLeod's retirement benefit based on two different periods of service." We agree with the Board.

¶ 12 "Under our rules of statutory construction, we look first to the statute's plain language to determine its meaning." *Sindt v. Retirement Bd.*, 2007 UT 16, ¶ 8, 157 P.3d 797 (citation and internal quotation marks omitted). To determine the meaning of the plain language, we examine the statute "in harmony with other statutes in the same chapter and related chapters." *LPI Servs. v. McGee*, 2009 UT 41, ¶ 11, 215 P.3d 135 (internal quotation marks omitted). In addition, the Utah State Retirement and Insurance Benefit Act "shall be liberally construed to provide maximum benefits and protections consistent with sound fiduciary and actuarial principles." Utah Code Ann. § 49–1–102(2).

¶ 13 This issue before us is controlled by section 49–1–505(3). This section speaks of a public safety employee in McLeod's position as having two retirements, an "original retirement" and a "subsequent retirement":

(3) If a member is reinstated to active service and subsequently retires after the two-year period as provided in Subsection (1)(a)(iv), the member's retirement allowance shall be calculated using:

(a) the formula in effect at the date of the member's *original retirement* for all service prior to that date; and

(b) the formula in effect at the date of the *subsequent retirement* for all service rendered between the first and the subsequent retirement dates.

*Id.* § 49–1–505(3) (emphases added). The case at bar involves the calculation of McLeod's retirement allowance for service rendered prior to his original retirement. Under subsection 505(3), the retirement allowance for this period is calculated using the formula in effect at the date of his original retirement. That formula is found in Utah Code section 49–4a–402:

Upon the service retirement of a member under Section 49–4a–401, the member shall receive a retirement allowance determined as follows:

(a) 2 1/2% of *final average monthly salary* multiplied by the number of years of service credit, limited to 20 years, plus

(b) 2% of *final average monthly salary* multiplied by the number of years of service credit in excess of 20 years, up to a maximum of 70%.

*Id.* § 49–4a–402 (1998) (emphasis added). " 'Final average salary' means the amount computed by averaging the highest three years of annual compensation *preceding retirement . . . .*" *Id.* § 49–4a–103(2) (emphasis added).

¶ 14 The instant dispute centers on McLeod's final average salary. URS used the final average salary preceding his 1996 retirement to calculate his retirement allowance for the first twenty years of service and the final average salary preceding his 2007 retirement to calculate his retirement allowance for the eight years of service. McLeod contends that URS should have used the final average salary preceding his 2007 retirement to calculate his retirement allowance for the entire period of his service. This is not how we read the statutes.

¶ 15 An employee's final average salary is "computed by averaging the highest three years of annual compensation *preceding retirement.*" *Id.* § 49–4a–103(2) (emphasis added). McLeod reads "retirement" in this section to refer to his 2007 retirement. But, as noted above, section 49–1–505(3) speaks in terms of two retirements for employees, like McLeod, whose service is discontinu-

ous—their "original retirement" and their "subsequent retirement." *Id.* § 49–1–505(3). And while McLeod's high-earning years preceded his subsequent retirement, they did not precede his original retirement. Therefore, under the statutes read together, the income from those years may not be used to calculate his retirement allowance for service preceding his original retirement. The plain language of the statute, as we read it, requires that an employee's retirement allowance for service prior to his original retirement be calculated using the formula, including income amounts, in effect at the date of the original retirement, just as if he had not returned to work.

¶ 16 McLeod reads the phrase "formula in effect" to refer only to the empty formula defined by section 49–4a–402 (retirement allowance = 2.5% × final average salary × years of service) and not to the formula containing the relevant data (McLeod's retirement allowance = 2.5% × $50,000 × 20 years). Because section 49–4a–402 was not amended between his original retirement and his subsequent retirement, he reasons, the formula in effect did not change and thus a single calculation is all that is required. Under this theory, only if the Legislature altered the empty formula—for example, by altering the 2.5% and 2.0% figures—would two separate calculations be required, one using the formula in effect at the date of the original retirement, the other the formula in effect at the date of the subsequent retirement. According to McLeod, then, a retiree's date of retirement dictates which retirement percentage rate is used.

¶ 17 Legislative action in 2010 refutes this reading. In 2010, the Legislature did change the statutory formula, reducing the applicable percentage rate to 1.5%, *see* Utah Code Ann. § 49–23–304(2) (2010), and applying the percentage to the average of the employee's highest five years of annual compensation preceding retirement, *see id.* § 49–23–102(3).

If McLeod's interpretation of section 49–1–505 were correct, this new formula would apply to all employees retiring after the effective date of the amendment, since it would be the formula in effect at the date of those employees' retirement. However, the new 1.5% rate applies only to retirees employed or re-employed on July 1, 2011, and thereafter. *See* Utah Code Ann. § 49–23–201(2) (2010). Thus, the date of hiring dictates which rate is used, not the date of retirement, as would be the case if McLeod's interpretation of section 49–1–505 were correct. Accordingly, "the formula in effect at the date of the member's original retirement for all service prior to that date" as used in section 49–1–505(3) refers not to the empty statutory formula, but the statutory formula containing the retiree's actual years of service and actual final average salary.

¶ 18 We are cognizant of our obligation to construe the Act "liberally . . . to provide maximum benefits and protections consistent with sound fiduciary and actuarial principles," *see id.* § 49–1–102(2) (1998). However, we do not read that admonition as license to construe the provisions of the Act other than according to their plain language. Read in context, the "highest three years of annual compensation preceding retirement," *see id.* § 49–4a–103(2), for purposes of calculating McLeod's retirement allowance for service before his original retirement date, refers to the highest three years of annual compensation preceding his original retirement, not those preceding his subsequent retirement. We therefore affirm the Board on this issue.[2]

## II. Equitable Estoppel

¶ 19 McLeod also contends that the Board erred by rejecting his claim that URS is equitably estopped from calculating his retirement benefit other than as a single con-

---

**2.** We note that URS used a 2% multiplier in calculating McLeod's retirement allowance for service after his original retirement. In other words, URS treated McLeod's service as a single period of employment for purposes of choosing applicable percentages, but as two distinct periods of employment for purposes of choosing his highest three years of compensation—the worst

of both worlds for McLeod. However, McLeod did not appeal this apparent inconsistency and consequently we do not pursue it. *See Brigham City v. Stuart,* 2005 UT 13, ¶ 14, 122 P.3d 506 (refusing to consider even "constitutional issues which have not been properly preserved, framed and briefed"), *rev'd on other grounds by* 547 U.S. 398, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006).

tinuous period of service. McLeod maintains that he made "life-changing decisions in regard to his retirement benefits" based on statements made by unidentified URS representatives over the telephone to the effect that his retirement allowance would be calculated by treating his two stints at Davis County as a single continuous period of service. Consequently, he reasons, URS should be equitably estopped from calculating his benefits any other way.

■ ¶ 20 Generally, "the doctrine of estoppel is not assertable against the state and its agencies." *Eldredge v. Utah State Ret. Bd.*, 795 P.2d 671, 675 (Utah Ct.App.1990). "Utah Courts have, however, carved out an exception to this general common law rule in unusual circumstances 'where it is plain that the interests of justice so require.'" *Id.* (quoting *Utah State Univ. v. Sutro & Co.*, 646 P.2d 715, 718 (Utah 1982)). On one hand, "[t]he critical nature of the irrevocable, once-in-a-lifetime retirement decision of a public employee imposes a strict duty of certitude upon those charged with the supervision and implementation of the system." *Id.* at 676. On the other, in such cases, "'the critical inquiry is whether it appears the facts may be found with such certainty, and the injustice to be suffered is of sufficient gravity, to invoke the exception.'" *Id.* at 675 (quoting *Sutro & Co.*, 646 P.2d at 720).

■ ¶ 21 Equitable estoppel has three elements:

(1) a statement, admission, act, or failure to act by one party inconsistent with a claim later asserted; (2) reasonable action or inaction by the other party taken on the basis of the first party's statement, admission, act, or failure to act; and (3) injury to the second party that would result from allowing the first party to contradict or repudiate such statement, admission, act, or failure to act.

*Id.* At issue here is the first prong of this test. McLeod has alleged that URS made statements inconsistent with the position it later asserted; the question is whether he proved that allegation in the hearing below.

¶ 22 Although our courts have never required that the governmental statement be written, our supreme court has observed that "[t]he few cases in which Utah courts have permitted estoppel against the government have involved very specific written representations by authorized government entities." *Anderson v. Public Serv. Comm'n*, 839 P.2d 822, 827 (Utah 1992). In both *Celebrity Club, Inc. v. Utah Liquor Control Commission*, 602 P.2d 689 (Utah 1979), and *Eldredge v. Utah State Retirement Board*, 795 P.2d 671 (Utah Ct.App.1990), Utah appellate courts applied equitable estoppel against government entities based on "very clear, well-substantiated representations by government entities." *Anderson*, 839 P.2d at 828 (discussing *Celebrity Club* and *Eldredge* ). Conversely, in *Anderson v. Public Service Commission*, 839 P.2d 822, 827 (Utah 1992), the governmental entity made "no specific statement or written representation." *Id.* Instead, the only evidence of the government entity's representation was the petitioner's "claim, in his own attorney's letter." *Id.* The supreme court accordingly declined to apply equitable estoppel against the government entity. *See id.*

¶ 23 Here, McLeod did not rely on a specific, clear, well-substantiated written representation from URS. Instead, he relied on oral statements made to him in three telephone conversations in 1996. He maintains that unnamed URS employees assured him that he could retire, draw retirement benefits, return in two years to the same office, retire again, and receive a retirement allowance calculated as if his service had been continuous. Neither party has any record of these telephone calls. In fact, the retirement director at URS specifically denied that URS would have informed McLeod that discontinuous service segments would be calculated as if they were a single continuous period.

¶ 24 McLeod maintains that his recollection of the conversations is corroborated by URS forms later sent to him and posted on its website. For example, about a year after his return to Davis County, URS sent McLeod a written annual statement of his defined benefit retirement account. This form amalgamated McLeod's service before and after his original retirement, consistent with McLeod's account of the telephone con-

versation. However, the form contained a disclaimer warning the employee that "[t]hese estimates are not a guarantee of retirement eligibility nor the amount of any future benefits. . . . YOUR ACTUAL BENE-FIT MAY DIFFER." This form and those posted on the URS website do have some tendency to corroborate McLeod's recollection of the telephone conversations. However, because they were generated after McLeod's original retirement, McLeod cannot and does not claim to have acted in reliance on them. In addition, in our view, they fall short of "very clear, well-substantiated representations by government entities." *Anderson,* 839 P.2d at 828 (discussing *Celebrity Club* and *Eldredge*).

¶ 25 McLeod also asserts that his recollection of the telephone conversations is corroborated by the fact that he reported the conversations to his wife and Sheriff Cox at the time and even left his job at Davis County in reliance upon them. These facts demonstrate, in the words of the Board's hearing officer, that "McLeod came away from those phone conversations with URS with the understanding that he could retire, draw retirement, return in two years to the same office, retire later a second time and have his retirement benefit calculated on the basis of one period of employment." However, after an evidentiary hearing, the Board's adjudicative officer also found that McLeod did not meet "his burden of proof that he was actually told that." What McLeod was "actually told" is a question of fact reviewed on appeal for clear error. *See Whitaker v. Utah State Ret. Bd.,* 2008 UT App 282, ¶ 11, 191 P.3d 814.

¶ 26 We recognize and reaffirm the "strict duty of certitude" imposed upon URS in advising a public employee concerning "the irrevocable, once-in-a-lifetime retirement decision." *See Eldredge,* 795 P.2d at 676. But we cannot ignore a petitioner's burden to establish the factual predicate of estoppel against a governmental entity with something approaching "certainty." *See id.* at 675. The adjudicative officer concluded, "I find no certainty here in trying to reconstruct what was said in oral conversations taking place in 1996 between McLeod and unknown persons at URS." On the mixed

record before us, we cannot say that this finding was clearly erroneous.

¶ 27 Because McLeod did not establish the first prong of the equitable estoppel test, his claim fails. We thus affirm the Board's ruling on this point.

## CONCLUSION

¶ 28 We agree with the Board that relevant provisions of the Utah State Retirement Act require that McLeod's retirement allowance for his two periods of service be calculated separately. In addition, the Board did not clearly err in finding that McLeod failed to meet the high evidentiary standard required to establish that URS misrepresented this point to him in telephone conversations before his original retirement. The Board's decision is accordingly affirmed.

¶ 29 WE CONCUR: WILLIAM A. THORNE JR. and STEPHEN L. ROTH, Judges.