**PLATEAU MINING COMPANY, a Delaware Corporation, and Cyprus Western Coal Equipment Company, a Delaware Corporation, Plaintiffs and Appellees,**

v.

**The UTAH DIVISION OF STATE LANDS AND FORESTRY, Ralph Miles, Director of the Division of State Lands and Forestry, Utah Department of Natural Resources, Dee Hansen, Executive Director of the Utah Department of Natural Resources, Defendants and Appellants.**

**BLACKHAWK COAL COMPANY, Plaintiff and Appellee,**

v.

**The UTAH DIVISION OF STATE LANDS AND FORESTRY, et al., Defendants and Appellants.**

**CONSOLIDATION COAL COMPANY, The Pittsburg & Midway Coal Mining Company, Plaintiffs and Appellees,**

v.

**The UTAH DIVISION OF STATE LANDS AND FORESTRY, et al., Defendants and Appellants.**

**TRAIL MOUNTAIN COAL COMPANY, Plaintiff and Appellee,**

v.

**The UTAH DIVISION OF STATE LANDS AND FORESTRY, et al., Defendants and Appellants.**

Nos. 880120, 880215, 880243 and 880300.

Supreme Court of Utah.

Nov. 20, 1990.

---

R. Paul Van Dam, Gayle F. McKeachnie, Clark B. Allred, David S. Christensen, Salt Lake City, for Utah State Lands and Forestry.

James M. Elegante, Patricia J. Winmill, Lucy B. Jenkins, Kenneth R. Barrett, Salt Lake City, for Plateau Min. Co.

Hugh C. Garner, Salt Lake City, for Blackhawk Coal Co.

Keith E. Taylor, Patricia J. Winmill, Lucy B. Jenkins, Kenneth R. Barrett, Salt Lake City, for Consolidation Coal Co.

Calvin L. Rampton, Richard B. Johns, Salt Lake City, for Trail Mountain Coal Co.

STEWART, Justice:

The plaintiffs in this consolidated case, four mining companies, brought actions for declaratory judgments against the Utah Division of State Lands and Forestry (the "State") for an adjudication of their liability under the royalty provisions of certain coal leases. The State appeals summary judgments in favor of the four mining companies.

## I. FACTS

The issues in each of these consolidated cases arise out of the same standard lease form. The leased land is school trust land.

A brief explanation of the nature of school trust lands provides a background for the application of the governing legal principles. When Utah became a state, the United States granted lands to the State for the support of the common schools. Utah Enabling Act §§ 6, 10, 28 Stat. ch. 138, at 107 (1894). The state of Utah accepted those lands for that purpose. Utah Const. art. XX, § 1.

The Utah Division of State Lands and Forestry is charged with the duty of administering those lands. Utah Code Ann. § 65-1-14 (1986).[1] The State leased lands located in Carbon and Emery Counties for the mining of coal to the predecessor of Plateau Mining Company in 1965, the predecessor of Blackhawk Coal Company in 1960, the predecessor of Consolidation Coal Company in 1968, and the predecessor of Trail Mountain Coal Company in 1965.

A standard lease form prepared by the State was used in each of the transactions. It authorized the lessee to extract coal in exchange for a royalty specified in Article III of the lease. The royalty provision states:

The Lessee, in consideration of the granting of the rights and privileges aforesaid, hereby covenants and agrees as follows:

. . . .

SECOND: To pay to Lessor quarterly, on or before the 15th day of the month succeeding each quarter, royalty

(a) at the rate of 15¢ per ton of 2000 lbs. of coal produced from the leased premises and sold or otherwise disposed of, or

(b) at the rate prevailing, at the beginning of the quarter for which payment is being made, for federal lessees of land of similar character under coal leases issued by the United States at that time, whichever is higher. . . .

The lease also stated: "This lease is granted subject in all respects to and under the conditions of the laws of the State of Utah and existing rules and regulations and such operating rules and regulations as may be hereafter approved and adopted

1. Currently Utah Code Ann. §§ 65A-1-4, -4-3, -7-1 (Supp.1990).

by the State Land Board." The lessee was required to prepare and submit quarterly to the State a certified statement reporting the amount of production of the mine and any other information the State required.

Plaintiffs mined coal under these leases during various periods and paid royalties under paragraph "second," subdivision (a) of the leases. The royalty reporting forms provided by the State required a report of "Royalty Data," on a form which had two columns that corresponded to the alternative royalty provisions, one headed "¢/T Basis" (i.e. cents per ton) and the other "Percentage Basis." Each column provided the formula for calculating a royalty on the basis stated. Throughout the entire term of these leases, plaintiffs completed the column entitled "¢/T Basis" and paid the 15¢ per ton royalty except for Consolidation, which paid at a rate of 17.5¢ per ton. The State accepted these statements and royalty payments without objection.

The federal coal lease royalty rate generally remained at 15¢ per ton until 1976, when Congress enacted the Federal Coal Leasing Amendments Act, 90 Stat. 1083 (1976). This Act allowed the Secretary of the Interior to promulgate regulations increasing the federal royalty rate on newly issued leases of underground mines to 8% of the value of the coal produced. 43 C.F.R. § 3473.3–2(a)(3) (1979). All the plaintiffs subsequently entered into leases with the federal government at the 8% rate.

Although the federal rate had increased, the plaintiffs continued to pay royalties at the lower 15¢ per ton rate except that Consolidation paid 17.5¢. In 1980, the State represented to Plateau that its lease was in good standing, and in May 1985, the State represented to Cyprus Western Coal Equipment Company, a successor to Plateau, that Plateau royalty payments were current. Thereafter, Cyprus acquired Plateau.

However, in 1982 the State notified Blackhawk that it expected to receive "future royalty payments at the same rate prevailing for similar federal coal leases in the area" under Article III, paragraph sec-

ond (b) of the lease. Blackhawk responded with a letter dated January 7, 1982, stating, "Blackhawk will continue to pay to the State, on a quarterly basis, the royalty of 15¢ per ton in compliance with Article III(a) of the original lease agreement, since the provisions of Article III(b) are inapplicable at the present time." Blackhawk continued to pay the royalty at the rate of 15¢ per ton until 1983, when the mine ceased production.

In December 1984, the State began to audit its coal leases. The audit included an analysis of the United States Bureau of Land Management records on federal coal leases and an examination of the records of the state coal lessees. The auditors found that the royalty rate on newly issued federal coal leases had increased to 8% in 1977 and that the plaintiffs had failed to report and pay royalties at the higher federal rate. After further consideration by another audit committee, the State demanded payment from the mining companies for delinquent royalties, interest, and penalties for the period April 1, 1979, to December 31, 1984. The State demanded $2,991,-613.44 from Plateau; $3,150,742.93 from Blackhawk; $197,193.09 from Consolidation; and $5,222,197.20 from Trail Mountain.

The plaintiffs requested hearings before the Board of State Lands. Hearings were held, and the audit findings upheld. The plaintiffs then filed actions for declaratory judgments to declare the Board's decisions invalid. In the Trail Mountain case, Trail Mountain and the State stipulated that the Division of State Lands relied upon each coal lessee to provide accurate production and royalty information on the royalty reporting form. They also stipulated that after 1976, all new federal coal leases issued for underground mines provided, with few exceptions, for an 8% royalty rate, that most federal coal leases were readjusted between 1979 and 1985 and increased to a royalty rate of 8% of value, and that management at Trail Mountain was aware of the Federal Coal Leasing Amendments Act and the regulations promulgated pursuant to the Act.

In granting the plaintiffs summary judgment, the trial court held that (1) the royalty provision in each lease was ambiguous; (2) the plaintiffs were not required to determine and apply the correct royalty rate; (3) the State was estopped from collecting past royalties through a retroactive audit; and (4) the State could not collect interest and penalties from the mining companies. In short, the trial court ruled that the plaintiffs owed nothing under the terms of their leases. The State appealed.

## II. CONTRACT INTERPRETATION

 The trial court held as a matter of law that the alternative royalty provision in the lease, Article III(b), was ambiguous and therefore unenforceable. We review the trial court's grant of summary judgment for correctness, giving no particular deference to the trial court's conclusions of law. *Ron Case Roofing and Asphalt Paving, Inc. v. Blomquist*, 773 P.2d 1382, 1385 (Utah 1989); *Madsen v. Borthick*, 769 P.2d 245, 247 (Utah 1988). In determining whether a material issue of fact exists, we do not defer to a trial court's conclusion on the matter. The filing of cross-motions for summary judgment does not necessarily mean that material issues of fact do not exist. *Amjacs Interwest, Inc. v. Design Assocs.*, 635 P.2d 53, 55 (Utah 1981).

 In ruling that the alternative royalty provision in Article III(b) was unenforceable, the trial court departed from established rules of contract interpretation. "The basic rule of contract interpretation is that the intent of the parties is to be ascertained from the content of the instrument itself.... Each contract provision is to be considered in relation to all of the others, with a view toward giving effect to all and ignoring none." *Utah Valley Bank v. Tanner*, 636 P.2d 1060, 1061–62 (Utah 1981); *Sears v. Riemersma*, 655 P.2d 1105, 1107–08 (Utah 1982). The plain meaning rule preserves the intent of the parties and protects the contract against judicial revision. *Hal Taylor Assocs. v. Unionamerica, Inc.*, 657 P.2d 743, 749 (Utah 1982); *Utah Valley Bank*, 636 P.2d at 1061.

 Parol evidence is generally not admissible to explain the intent of a contract which is clear on its face. *Faulkner v. Farnsworth*, 665 P.2d 1292, 1293 (Utah 1983). But if a contract is ambiguous, parol evidence is admissible to explain the parties' intent. *Colonial Leasing Co. v. Larsen Bros. Constr. Co.*, 731 P.2d 483, 487 (Utah 1986); *Faulkner*, 665 P.2d at 1293. Whether a contract is ambiguous is a question of law which must be decided before parol evidence is admitted. *Faulkner*, 665 P.2d at 1293. "[A] motion for summary judgment may not be granted if a legal conclusion is reached that an ambiguity exists in the contract and there is a factual issue as to what the parties intended." *Id.*

 When ambiguity does exist, the intent of the parties is a question of fact to be determined by the jury. *Colonial Leasing Co.*, 731 P.2d at 488. Failure to resolve an ambiguity by determining the parties' intent from parol evidence is error. *Winegar v. Smith Inv. Co.*, 590 P.2d 348, 350 (Utah 1979). If a contract is ambiguous, the court may consider the parties' actions and performance as evidence of the parties' true intention. *Zeese v. Estate of Siegel*, 534 P.2d 85, 90 (Utah 1975); *Bullfrog Marina, Inc. v. Lentz*, 28 Utah 2d 261, 268, 501 P.2d 266, 271 (1972); *Bullough v. Sims*, 16 Utah 2d 304, 309, 400 P.2d 20, 23 (1965).

 The trial court held the royalty provision ambiguous because the amount due was "based on several factors not immediately capable of definitive determination." However, a contract provision is not necessarily ambiguous just because one party gives that provision a different meaning than another party does. *Buehner Block Co. v. UWC Assocs.*, 752 P.2d 892, 895 (Utah 1988). To demonstrate ambiguity, the contrary positions of the parties must each be tenable. *See, e.g., Grow v. Marwick Dev., Inc.*, 621 P.2d 1249, 1252 (Utah 1980). Even if a provision is not "immediately capable of definitive determination," that does not necessarily make the provision unenforceable.

Thus, ambiguity in the royalty provision in the leases should not have ended the inquiry. Rather, the trial court should have received evidence to determine the meaning of the terms in the provision.

The language of the lease provision is clear. The intent of the parties was that the higher of the two rates should be paid the State. If ambiguity exists, it arises from the language that the "prevailing federal rate" shall be paid when it is higher than the ¢/T rate. Extrinsic evidence will, no doubt, have to be adduced to determine how that federal rate was to be calculated, what the rate was, and when it became "prevailing," if it did.

It follows that the trial court should not have held the alternative rate provision unenforceable because it is ambiguous. Professor Corbin states, "An agreement is not unenforceable for lack of definiteness of price or amount if the parties specify a practicable method by which the amount can be determined by the court without any new expression by the parties themselves." 1 A. Corbin, *Corbin on Contracts* § 98, at 433–34 (1963). It is only necessary that there be a reasonable method by which the court can determine the amount owed. In *Ferris v. Jennings*, 595 P.2d 857 (Utah 1979), this Court stated on a somewhat related issue:

> We have no disagreement with the general proposition that a contract will not be specifically enforced unless the obligations of the parties are "set forth with sufficient definiteness that it can be performed." But to be considered therewith is the further proposition that the parties to a contract are obliged to proceed in good faith to cooperate in performing the contract in accordance with its expressed intent. A contract is not fatally defective as to price if there is an agreement as to some formula or method for fixing it.

595 P.2d at 859 (quoting *Bunnell v. Bills*, 13 Utah 2d 83, 86, 368 P.2d 597, 600 (1962)) (footnotes omitted).

Thus, an agreement which sets a price that is determined by factors outside the contract, such as a market price or the price in another contract, is valid and enforceable. *States Marine Lines, Inc. v. Crooks*, 13 N.Y.2d 206, 213–14, 245 N.Y. S.2d 581, 586–87, 195 N.E.2d 296, 300 (1963); *Bruce v. Blalock*, 241 S.C. 155, 127 S.E.2d 439 (1962); *Combs v. Frigid Foods Products, Inc.*, 67 Wash.2d 862, 866, 410 P.2d 780, 782 (1966). Indeed, the validity of leases calling for royalties based on market price does not appear to be at issue in most cases. *See Foster v. Atlantic Refining Co.*, 329 F.2d 485 (5th Cir.1964); *Holmes v. Kewanee Oil Co.*, 233 Kan. 544, 664 P.2d 1335 (1983), *cert. denied*, 474 U.S. 953, 106 S.Ct. 322, 88 L.Ed.2d 305 (1985); *Texas Oil & Gas Corp. v. Vela*, 429 S.W.2d 866 (Tex.1968); *State v. Moncrief*, 720 P.2d 470 (Wyo.1986).

The alternative rate provision, based on the prevailing federal rate clause, provides a practicable method by which the appropriate royalty can be determined. In 1976, Congress enacted the Federal Coal Leasing Amendments Act, which provides in part:

> A lease shall require payment of a royalty in such amount as the Secretary shall determine of not less than 12½ per centum of the value of coal as defined by regulation, except the Secretary may determine a lesser amount in the case of coal recovered by underground mining operations.

30 U.S.C. § 207(a) (1988). The regulations promulgated under the Act provide:

> (a)(1) Royalty rates shall be determined on an individual case basis prior to lease issuance. For competitive leases, initial royalty rates shall be set out in the notice of lease sale.
>
> (2) A lease shall require payment of a royalty of not less than 12½ percent of the value of the coal removed from a surface mine.
>
> (3) A lease shall require payment of a royalty of not less than 8 percent of the value of coal removed from an underground mine, except that the authorized officer may determine a lesser amount, but in no case less than 5 percent if conditions warrant.

43 C.F.R. § 3473.3–2 (1989).

The alternative rate provision is sufficiently clear to be enforceable. If there is

ambiguity as to how the prevailing federal rate clause should be applied, the trial court should admit parol evidence to clarify its construction. The trial court's granting of plaintiffs' motions for summary judgment under these circumstances was inappropriate.

Consolidation asserts that it agreed with the State in 1981 that the prevailing federal rate was 17.5¢ per ton, the same as in its federal lease at the time. If such an agreement were made, it may be relevant to the interpretation of the prevailing federal rate provision, as it applies to Consolidation. Consolidation also asserts that its agreement fixed the rate at 17.5¢ until readjustment in January 1988. Because the matter was decided on a motion for summary judgment, the trial court did not determine whether the parties entered into such an agreement, and our review of the record does not reveal any evidence which supports Consolidation's claim that the rate was fixed until 1988. The matter may, of course, be decided in a trial on the merits.

■■■ Evidence of the parties' course of conduct might also be relevant. The plaintiffs argue, and the trial court held, that the parties established a course of conduct to the effect that royalty payments should be based on the 15¢–per–ton rate, the implication being that the parties adopted a construction of the lease contrary to the prevailing federal rate provision. The State's acceptance of the lower rate, however, does not show a practical construction of the lease by the State that the lower royalty rate was the rate the plaintiffs should pay. The plaintiffs were responsible for calculating the alternative federal prevailing royalty payments for the royalty reporting form that they had to submit to the State. The State had a right to rely on the good faith of its lessees in calculating the royalty and submitting the required information.

Furthermore, the plaintiffs' argument, if accepted, would in effect read the alternative royalty provision out of the lease. The doctrine of practical construction can have no such force on these facts. Professor

Corbin has explained the governing principles:

> There are many other bases of [contract] interpretation besides the practical application base. The present doctrine does not cause them to be discarded; indeed, they may produce a de[g]ree of conviction that overpowers inferences to be drawn from practical application by the parties. When such is the case, the court may say that when the meaning of the contract is plain and unambiguous, a different meaning will not be adopted on the basis of practical application by the parties. In saying this, however, the court should not mean that the words of the contract define themselves; instead, it should first consider carefully all the usual sources and methods of interpretation, including the practical interpretation of the parties.

3 A. Corbin, *Corbin on Contracts* § 558, at 258 (footnote omitted). The State's acceptance of royalty payments based on the lower 15¢–per–ton rate, as calculated by the plaintiffs, does not amount to knowledge that the higher rate was applicable and does not prove that the State did not intend to apply the alternative rate provision.

■■■ The plaintiffs also claim that the alternative royalty provision was not self-executing and placed no responsibility on them to calculate and pay the higher federal rate without some affirmative action on the part of the State. The trial court agreed and held that the provision was "not self-executing as to create a legal obligation on the lessee...." That conclusion ignores the plain language of the lease. Article III of the lease states that the lessee "covenants and agrees" to pay whichever rate is higher. Further, under Article III, the lessees were required to prepare and forward a certified statement of the amount of production. The State did not instruct the plaintiffs to pay any specific amount or rate. Throughout the terms of the leases, the plaintiffs completed the royalty reporting form by filling out the column headed "¢/T Basis" and leaving blank the column headed "Percentage Basis." Although the plaintiffs were initially

responsible for determining the proper royalty rate and the total amount owed, those determinations are not binding on the State. This conclusion is supported by R. 632-5-4 of the Utah Administrative Code (1990), which states: "The division shall have the right at reasonable times and intervals to audit the books and records of any lessee ... and to inspect the leased ... premises and conduct field audits for the purpose of determining whether there has been compliance with the rules or the terms of agreement."

In sum, the plaintiffs had the duty to determine whether the prevailing ·federal rate was higher and, if so, to pay at that rate. The alternative royalty provision did not require any affirmative action by the State. Summary judgment on this issue was inappropriate.

## III. ESTOPPEL

The trial court ruled as a matter of law that the State was estopped from obtaining royalty payments at the prevailing federal rate. The court held that in entering the lease, the State acted in a proprietary capacity, that the doctrine of equitable estoppel applied against the State, and that even if the State were acting in a governmental capacity, it was still estopped because there was no substantial effect on public policy. The State argues that the facts do not support a finding of estoppel and that estoppel is not available when the State acts in its governmental capacity, as it asserts it did. Because the requirements of estoppel are not met, it is not necessary to decide whether the State acted in a governmental or proprietary capacity when leasing school trust lands.

Generally, estoppel may not be asserted against the State. *Utah State Univ. v. Sutro & Co.*, 646 P.2d 715, 718 (Utah 1982). However, there is an exception to this rule "when its rigid application would defeat,

rather than serve, the higher purpose that all rules are intended to serve: that of doing justice." *Id.* (footnote omitted). Thus, in "unusual circumstances," when the rule's "application would result in injustice, and there would be no substantial adverse effect on public policy, the courts will honor the higher purpose of doing justice by invoking the exception...." *Id.* Under these circumstances, the State may be estopped even when it acts in its governmental capacity. *Celebrity Club, Inc. v. Utah Liquor Control Comm'n*, 602 P.2d 689, 694 (Utah 1979).

The elements of estoppel are "(1) an admission, statement, or act inconsistent with the claim afterwards asserted, (2) action by the other party on the faith of such admission, statement, or act, and (3) injury to such other party resulting from allowing the first party to contradict or repudiate such admission, statement, or act." *Id.* (citing *West v. Dep't of Social and Health Services*, 21 Wash.App. 577, 579, 586 P.2d 516, 518 (1978)).[2] "Estoppel is a doctrine of equity purposed to rescue from loss a party who has, without fault, been deluded into a course of action by the wrong or neglect of another." *Morgan v. Board of State Lands*, 549 P.2d 695, 697 (Utah 1976).

■ The State may not be estopped unless injustice would result and there would be no substantial adverse effect on public policy. There is no injustice in requiring the plaintiffs to pay royalties at the prevailing federal rate when they knew that the lease required them to pay at the "prevailing" rate. Furthermore, it is important to consider that in administering the school trust lands, the State acts as a trustee and its duties are the same as the duties of other trustees. *Department of State Lands v. Pettibone*, 216 Mont. 361, 702 P.2d 948, 953-54 (1985); *Oklahoma Educ. Ass'n v. Nigh*, 642 P.2d 230, 235-36

---

**2.** In *Morgan v. Board of State Lands*, 549 P.2d 695, 697 (Utah 1976), also dealing with school trust lands, this Court stated:

Estoppel arises when a party (defendant Board) by his acts, representations, or admissions, or by his silence when he ought to speak, intentionally or through culpable negli-

gence, induces another (plaintiffs) to believe certain facts to exist and that such other (plaintiffs) acting with reasonable prudence and diligence, relies and acts thereon so that he will suffer an injustice if the former (Land Board) is permitted to deny the existence of such facts.

(Okla.1982); *County of Skamania v. State*, 102 Wash.2d 127, 132, 685 P.2d 576, 580 (1984). The State's duty of loyalty to the beneficiaries, *see* Restatement (Second) of Trusts § 170 (1959), includes the duty not to act in the interest of a third party at the expense of the beneficiaries by disposing of trust property for less than the agreed price. *Id.*, comment q. The plaintiffs knew or should have known that the leased lands were trust lands, and they also knew that the lease required them to pay the prevailing federal rate when it was the higher rate. There is no injustice in requiring them to pay the royalty required by the lease of the trust lands.

■ Furthermore, to estop the State would be to contravene the important public policy that the State should recover full value from the lease of school trust land. In *Lassen v. Arizona ex rel. Arizona Highway Department*, 385 U.S. 458, 466, 87 S.Ct. 584, 588, 17 L.Ed.2d 515 (1967), the United States Supreme Court stated, in reference to school trust lands, that the state must "receive the full value of any lands transferred from it." Utah law also implicitly requires that the State obtain full value for leases of school trust land. Article XX, section 1 of the Utah Constitution provides that state public lands "shall be held in trust for the people, to be disposed of as may be provided by law, for the respective purposes for which they have been ... granted." In *Van Wagoner v. Whitmore*, 58 Utah 418, 433, 199 P. 670, 675 (1921), the Court stated that this constitutional provision is "an absolute limitation upon the power of the state to dispose of the lands, or permit them to be disposed of, except for the purpose for which they were granted by Congress." Section 6 of the Enabling Act states the purpose for which these lands are granted, which is "for the support of common schools." If the State were estopped from obtaining full value for leases of school trust lands, the purpose of the trust lands could be undermined. For these reasons, the exception to the rule

that the State may not be estopped is inapplicable under these circumstances.

Furthermore, the elements of equitable estoppel have not been met. For an estoppel to arise, the State must have made an admission, statement, or act inconsistent with the position the State now takes. The State's acceptance of the lower rate is not inconsistent with the lease provision that the plaintiffs are required to pay at the higher of the two rates because the lessees themselves were responsible for determining the proper rate at which royalty payments were made. Moreover, it cannot be said on this record that the plaintiffs were without fault or even that they acted with reasonable prudence and diligence in ascertaining the correct rate to be paid. *See Morgan*, 549 P.2d at 697.

The plaintiffs also argue that they would have suffered substantial losses from mining under the State leases if they were required to pay at the 8% rate and that they would, therefore, have pursued other options had they known the State would require an 8% royalty payment. In entering into the leases, the plaintiffs were fully aware that the 15¢–per–ton rate was not fixed for the term of the lease and that they had no guarantee against having to pay a higher royalty.

■ Furthermore, although the State asserts that it was entitled to an 8% royalty, the federal regulations establishing royalty rates for underground mining do not state that an 8% rate is necessarily required. *See Coastal States Energy Co. v. Hodel*, 816 F.2d 502, 507 (10th Cir.1987). Under the regulations, a royalty in a federal coal lease could require less than an 8% rate if conditions exist making it impossible to operate a mine at a profit.[3] On the other hand, the State asserts that of twenty-three coal leases issued by the United States Bureau of Land Management on lands within the state of Utah between January 1, 1979, and December 31, 1985, eighteen required a royalty payment of 8%. The plaintiffs themselves held federal leas-

---

**3.** This is not to say that the prevailing federal rate provision of the state lease assures the lessee of making a profit.

es requiring 8% royalties. Because the appropriate rate is the prevailing federal rate for land of similar character, the issue of what that rate should be is to be determined by the trial court on remand.

The conclusion that the State is not estopped from collecting additional royalties after accepting royalties at the lower rate is supported by case law from other jurisdictions. *See Foster v. Atlantic Refining Co.*, 329 F.2d 485, 490 (5th Cir.1964) ("[A]cceptance by the lessors of less royalty than that to which they were entitled does not 'extinguish the entire debt nor work an estoppel.'" (quoting *Arkansas Natural Gas Corp. v. Sartor*, 98 F.2d 527, 530 (5th Cir.1938))). *See also Holmes v. Kewanee Oil Co.*, 233 Kan. 544, 550, 664 P.2d 1335, 1341 (1983), *cert. denied*, 474 U.S. 953, 106 S.Ct. 322, 88 L.Ed.2d 305 (1985); *Texas Oil & Gas Corp. v. Vela*, 429 S.W.2d 866, 875–76 (Tex.1968). An interesting comparison may be made to federal mineral and gas leases, under which acceptance of royalties is made subject to subsequent audit. *See Arch Mineral Corp. v. Lujan*, 911 F.2d 408, 411 (10th Cir.1990); *Shell Offshore Inc.*, 115 IBLA 205, 211 (July 3, 1990). Although no language in the leases at issue specifically makes the leases subject to subsequent audit, the leases are implicitly subject to such a limitation by virtue of the acknowledged right of the State to audit the books and records of the plaintiffs to determine compliance with the leases. Utah Admin.Code R. 632–5–4 (1990).

■ Although the State's acceptance of royalty payments at the lower rate is not a sufficient ground for invoking the doctrine of estoppel, there may be additional facts which could justify estoppel against the State. For example, Plateau, or more specifically its co-plaintiff and purchaser Cyprus, asserts that the state audit had uncovered the deficiency in royalty payments, but the State nevertheless assured Cyprus that the lease was in good standing. Plateau claims that Cyprus, relying on that assurance, consummated the purchase of Plateau three months after the audit had been completed. The State, on the other hand, argues that representations that the lease was in good standing had no application to the amount of royalty to be paid.[4] The State also argues that Cyprus and Plateau knew that the lease required payment at the higher of the two rates and knew that they were dealing with school trust land. Furthermore, it is possible that Plateau and Cyprus made arrangements for such a contingency in their purchase agreement. If so, this may have some bearing on the issue of estoppel against the State. Although summary judgment on the issue of estoppel was improper, the plaintiffs might be able to present evidence at trial which would support a finding of estoppel. This is an issue to be determined by the trial court.

■ Plateau and Blackhawk also argue that the State waived its right to enforce the alternative royalty provision. Although the issue of waiver was presented to the trial court, it did not rule on the issue. We state the law here for guidance to the trial court in deciding this issue on remand. "'A waiver is the intentional relinquishment of a known right.'" *American Sav. & Loan Ass'n v. Blomquist*, 21 Utah 2d 289, 292, 445 P.2d 1, 3 (1968) (quoting *Phoenix Ins. Co. v. Heath*, 90 Utah 187, 194, 61 P.2d 308, 311 (1936)). Mere silence is not a waiver unless there is some duty or obligation to speak. *Dalton v. LeBlanc*, 350 F.2d 95, 98–99 (10th Cir. 1965).

■ The State's acceptance of royalty payments in amounts less than the amount owed does not mean that the State waived its right to full payment. In *Holmes*, the Kansas Supreme Court stated that acceptance by a lessor of an amount "less than was owed under the terms of the leases" did not constitute a waiver. 233 Kan. at 550, 664 P.2d at 1341. "This issue has been resolved in the royalty owners' favor on numerous occasions." *Id.* We agree

---

**4.** The State also claims that the plaintiffs were not entitled to rely on the unauthorized or erroneous statements of government employees. The trial court did not consider this issue, and we do not address it on appeal.

that the State has not impliedly waived its right to a higher royalty by acceptance of the lesser royalty for a period when the higher royalty should have been paid.

## IV. ADMINISTRATIVE LAW

■ Plateau, Consolidation, and Blackhawk argue on appeal that the State's interpretation of the lease is essentially a new royalty policy and that the State cannot adopt such a policy unless it complies with the procedures of the Utah Administrative Rulemaking Act, Utah Code Ann. § 63–46a–1 to –16 (1986). The trial court did not address this issue, although the three plaintiffs raised it below.

Utah Code Ann. § 63–46a–2(8)(a) (1986) (currently § 63–46a–2(14) (Supp.1990)) provided:

"Rule" means a statement made by an agency that applies to a general class of persons, rather than specific persons and: (i) implements or interprets policy made by statute; or (ii) prescribes the policy of the agency in the absence of express statutory policy; or (iii) prescribes the administration of the agency's functions or describes its organization, procedures, and operations. "Rule" includes the amendment or repeal of an existing rule.

Utah Code Ann. § 63–46a–3(4) (1986) (currently § 63–46a–3(4) (1989)) provided:

Rulemaking is not required when:

(a) a procedure or standard is already described in statute;

(b) agency action affects an individual person, not a class of persons;

(c) agency action applies only to internal agency procedures; or

(d) grammatical or other insignificant rule changes do not affect agency policy or the application or results of agency actions.

The State's interpretation and attempted application of the lease provision at issue does not amount to rulemaking. *See Williams v. Public Serv. Comm'n*, 720 P.2d 773, 776–77 (Utah 1986). A comparison to federal law is useful on this point. In *Shell Offshore Inc.*, 115 IBLA 205 (July 3, 1990), the Minerals Management Service (MMS) had prepared a procedure paper setting out criteria by which royalties were to be calculated from oil and gas leases. According to an audit conducted pursuant to these criteria, Shell owed additional royalties for the years 1980–83. "Shell ... argued that the Procedure Paper was improperly accorded retroactive effect, especially where it represented a departure from MMS' previous acceptance of Shell's reported prices over a period of many years...." *Id.* at 208. In response to Shell's argument, the administrative judge stated: "On numerous occasions we have reviewed and rejected arguments that application of the Procedure Paper constituted a retroactive application of a new rule." *Id.* at 210.

Although federal administrative law does not control the resolution of the issue, that law is helpful. In the present case, the State simply seeks to rely on a known lease provision. The determination that a specific lease provision is enforceable is not rulemaking.

## V. LACHES

■ Blackhawk argues that the State is barred from recovery by the doctrine of laches. The trial court did not decide this issue, but it was raised below by Blackhawk. Laches bars a recovery when there has been a delay by one party causing a disadvantage to the other party. *Papanikolas Bros. Enters. v. Sugarhouse Shopping Center Assocs.*, 535 P.2d 1256, 1260 (Utah 1975). Laches has two elements: (1) lack of diligence on the part of the claimant and (2) an injury to the defendant because of the lack of diligence. *Id.* at 1260. The State argues that it did not pursue this matter because it was the lessees' duty to pay the proper royalty. Laches is inapplicable in this case; it was Blackhawk that defaulted in the performance of its duty.

## VI. STATUTE OF LIMITATIONS

Blackhawk also argues briefly that the State is barred from recovery on this claim by the statute of limitations. Utah Code Ann. § 78–12–23(2) (1987) provides that an

action on a written contract must be brought within six years. The trial court did not address this argument, and we decline to address it on appeal. At most, this argument would excuse a few months of delinquent royalty provisions. We leave this question to the trial court to consider.

## VII. INTEREST AND PENALTIES

The State's audit of the leases claimed charges for delinquent interest and penalties for failing to pay the proper royalty. The trial court did not allow charges because of its holding that the State could not recover any delinquent payments, but also gave other reasons why the State could not recover interest and penalties. Our reversal may affect the trial court's analysis of this issue, and we leave the matter for the trial court's determination.

We reverse the summary judgments in favor of Plateau, Blackhawk, Consolidation, and Trail Mountain and remand for further proceedings in accordance with this opinion.

HALL, C.J., HOWE, A.C.J., and DURHAM and ZIMMERMAN, JJ., concur.