2014 UT App 86

**NORTHGATE VILLAGE DEVELOPMENT, LC, Plaintiff and Appellant,**

v.

**OREM CITY, Defendant and Appellee.**

No. 20120817–CA.

Court of Appeals of Utah.

April 17, 2014.

J. Craig Smith and Kathryn J. Steffey, for Appellant.

Jody K. Burnett and George A. Hunt, for Appellee.

Judge J. FREDERIC VOROS JR. authored this Opinion, in which Judges STEPHEN L. ROTH and JOHN A. PEARCE concurred.

### Opinion

VOROS, Judge:

¶1 Orem City sold a parcel of land to Northgate Village Development. Northgate spent nearly three million dollars excavating material buried on the property. Northgate sued the City, claiming that the City failed to perform its contractual cleanup responsibilities. The district court granted summary judgment in the City's favor and limited Northgate's recovery to a single claim, valued at $1,965. Northgate appeals. We affirm in part, reverse in part, and remand.

### BACKGROUND [1]

¶2 For years the City operated a public works facility on City-owned property located at 900 West in Orem. The City mined sand from the property for use in public works projects and filled the resulting holes "with fill material left over from various Public Works operations." Though "[m]ost of the fill material consisted of dirt and rock," later excavation unearthed a trove of urban detritus:

car bumpers, bicycle tires, water heaters, washing machines, car engines, car parts, asphalt, galvanized pipes, asbestos containing transit pipe, trees, bushes, medical waste products, brick, mason blocks, concrete, toilets, electrical panels, refrigerators, silverware, 50-gallon drums, conduit, general garbage, storm drains, ABS pipe, barbed wire, field fence, cedar fence posts, railroad ties, plywood, carpet, transformers, mercury-containing ballasts, gas cables, truck mud flaps, plastic sheeting, car doors, pallets, rebar, pop bottles, sewer pipe, metal T posts, fire hydrants, water [vials], ductile iron, copper[ ] parts and valves, brass parts, fiberglass insulation, twine, rubber traffic cones, concrete manhole sections, metal rings, and lids for manholes, valve boxes, bags of leaves and metal sheeting for roofs.

### The Land Sale Contract

¶3 When the City decided to relocate the public works facility, it sold the Public Works Parcel on 900 West to Northgate. The City and Northgate signed a "Real Property Exchange and Sale Agreement" in March 2004 and an amended agreement in May 2004. The May 2004 Land Sale Contract divided the purchase and exchange of property into two phases: Closing 1 and Closing 2. At Closing 1, the City and Northgate would exchange two parcels of equal value and the City would purchase two additional pieces of Northgate property. At Closing 2, Northgate would purchase two pieces of the City's property, including the Public Works Parcel.

¶4 Section 3.2.1 of the Land Sale Contract describes environmental audits conducted on the properties. Section 3.2.1.1 allowed Northgate to rescind the contract if it found the results of the environmental audit of the City's properties unacceptable. The City agreed to provide Northgate with a copy of an "Environmental Site Assessment" and "a list of environmental concerns/conditions with the estimated cost of resolving each of

---

1. When reviewing the district court's grant of summary judgment, we view "the facts and all reasonable inferences drawn therefrom in the light most favorable" to Northgate, the nonprevailing party below. See *Orvis v. Johnson*, 2008 UT 2, ¶6, 177 P.3d 600 (citation and internal quotation marks omitted); *see also Black v. Allstate Ins. Co.*, 2004 UT 66, ¶9, 100 P.3d 1163.

the concerns ("the Environmental Clean–Up List')." Section 3.2.1.1 adds, "A copy of the Environmental Clean–Up List is attached hereto ... and incorporated herein by reference."

¶ 5 Section 4.3 of the Land Sale Contract describes the parties' post-Closing 2 responsibilities, which would "survive Closing 2 and the conveyance of the deeds." Section 4.3.2, titled "Demolition and Clean-up of Northgate Lease Property," required the City to perform certain work on the Public Works Parcel before it turned the property over to Northgate. The City agreed "to complete any environmental clean-up responsibilities specified in the written action plan for the City Public Works Parcel."

¶ 6 The Land Sale Contract also contains a provision discussing Section 108 loans, which are federally financed loans offered to qualified redevelopment projects. The provision describes Northgate's intent "to apply for Section 108 loan money and [other redevelopment] grant money" through Orem's Economic Development Commission. But the provision also states, "The City cannot make any representations to Northgate as to whether Northgate will receive these funds."

¶ 7 Finally, the Land Sale Contract contains a provision addressing default and cure. It requires the nondefaulting party to provide notice and allow ninety days for the defaulting party to cure the default. The nondefaulting party "may pursue any remedies available to it" only after the ninety-day window has closed.

*Excavation and Redevelopment*

¶ 8 Northgate and the City proceeded with Closing 1 and Closing 2. After Northgate took control of the Public Works Parcel, it began excavating the buried debris. Each time Northgate uncovered "another major strike" of material contained in the Environmental Site Assessment, it contacted the Orem City Manager's office. Northgate representatives met with the City Manager several times at the excavation site. At one meeting, Northgate asked the City Manager how the City planned to address its concerns about the buried debris. The City Manager responded, "We probably have responsibility here. If you will ... send me an invoice and some kind of verification of what you have done, ... we'll see what we can do about it."

¶ 9 In January 2007, Northgate sent the City a letter detailing "a major problem with debris ... found during excavation of the site." The letter contained contractor reports, a cost breakdown, a list of excavated materials, and photographs of the excavation. The letter also described Northgate's discovery of unexpected fill material:

You asked us to provide you with costs to date and an estimate for future costs to clean up the site. As you know, we understood from soil reports provided by the city, there was an area midway in the site, that had asphalt and concrete as fill. Instead, we found to date, over 100,000 cubic yards of garbage, vehicles, appliances, organic matter, and other debris that can only be characterized as landfill.... Our costs for clean up to date approach $2,000,000 and we believe the balance of the site will cost an additional $500,000–$700,000 to clean up the site.

As per our agreement we expect the city to reimburse us the cost of clean up. We are not in a position to absorb those costs as a part of the project.

¶ 10 Northgate applied for federal redevelopment loans and grants to help cover the cost of rehabilitating the Public Works Parcel. Orem's Economic Development Commission reviews and recommends redevelopment-fund applicants, but because the federal redevelopment funds go directly to municipalities, the City ultimately determines how to distribute the federal redevelopment funds it receives.

¶ 11 Orem's Economic Development Commission recommended Northgate's application to the City. In September 2008 a City representative sent an email to a representative at the Department of Housing and Urban Development explaining the City had decided not to offer Northgate Section 108 loans but that Northgate may still be a good candidate for Brownfields Economic Development Initiative (BEDI) funding, a type of redevelopment grant:

Originally, Northgate wanted both Section 108 and BEDI funding. The city decided that we could not expend more Section 108 money, and with the amount that we have spent, we would only be eligible to receive $220,000 in BEDI funds. The Northgate project has had extensive clean-up work on the site, and it will create many [low- to moderate-income] jobs, so we feel confident it is a great project to receive BEDI funding.

However, BEDI funds must be used in conjunction with Section 108 funding, so the City's decision not to expend Section 108 funds on Northgate also prevented the City from receiving BEDI funds.

### The District Court Proceedings

¶ 12 Northgate brought five claims against the City: (1) breach of contract, (2) breach of the implied covenant of good faith and fair dealing with respect to the environmental clean-up, (3) unjust enrichment, (4) equitable restitution, and (5) breach of the implied covenant of good faith and fair dealing with respect to the redevelopment funds. The City asked the district court to dismiss Northgate's third, fourth, and fifth claims. The district court deemed Northgate's fifth claim viable but dismissed Northgate's unjust-enrichment and restitution claims. The court concluded, "Because of the unique facts claimed here, Causes Three and Four should be dismissed without prejudice. It is not outside of theoretical contention that discovery potentially could support such remedies, but it is difficult to envision."

¶ 13 Northgate moved for partial summary judgment on its breach-of-contract claim. The City moved for summary judgment on all three remaining claims. The district court granted summary judgment for the City, "subject only to payment by the City of unpaid costs, if any, incurred by Northgate for removing and disposing of buried transformers."

### ISSUES AND STANDARDS OF REVIEW

¶ 14 Northgate appeals both of the district court's summary judgment determinations. First, Northgate contends that the district court erred in denying its motion and grant-

ing the City's motion for summary judgment on Northgate's breach-of-contract claim. Second, Northgate contends that the district court erred in granting the City's summary judgment motion on the issue of the implied covenant of good faith and fair dealing with respect to redevelopment funds. We review a district court's summary judgment for correctness, giving no deference to the district court's ruling. *Bahr v. Imus*, 2011 UT 19, ¶ 15, 250 P.3d 56.

¶ 15 Northgate also contends that the district court erred by dismissing its equitable claims. We review the district court's dismissal of Northgate's equitable claims for correctness, giving no deference to the district court's ruling. *See State v. Hamilton*, 2003 UT 22, ¶ 17, 70 P.3d 111.

### ANALYSIS

#### I. Breach of Contract

¶ 16 Northgate contends that the district court erred by denying its motion for partial summary judgment and granting the City's summary judgment motion. Northgate argues that the district court erred when addressing the City's opportunity-to-cure and notice arguments, when interpreting the term "written action plan," and when defining the City's contractual clean-up obligations.

#### A. Notice and Opportunity to Cure

¶ 17 Northgate asserts that the district court erred when it interpreted the Land Sale Contract "as requiring a written notice of default" before the nondefaulting party pursued legal remedies. Northgate maintains that oral notice satisfies the contract's notice requirement and that "Northgate orally notified [the City] of its default each time Northgate discovered" a new cache of buried debris.

¶ 18 The City responds that Northgate gave notice of default only by letter on January 7, 2008. By that time, "Northgate had already spent over $2,000,000 cleaning up debris." Because "the letter did not offer a right to cure," the City maintains, "no cause of action for breach accrued." In the City's

view, Northgate's oral notice failed "to meet the specific elements" the Land Sale Contract required.

¶ 19 "In interpreting a contract, we look to the language of the document to determine its meaning and the intent of the contracting parties." *Encon Utah, LLC v. Fluor Ames Kraemer, LLC,* 2009 UT 7, ¶ 15, 210 P.3d 263. "If the language within the four corners of the contract is unambiguous," a court determines the parties' intentions "from the plain meaning of the contractual language, and the contract may be interpreted as a matter of law." *Central Florida Invs., Inc. v. Parkwest Assocs.,* 2002 UT 3, ¶ 12, 40 P.3d 599.

¶ 20 But the law circumscribes a district court's authority to decide cases at the summary judgment stage. "Summary judgment allows disposition before trial on issues on which there is no genuine issue of material fact." *Hi-County Prop. Rights Grp. v. Emmer,* 2013 UT 33, ¶ 37, 304 P.3d 851; *see* Utah R. Civ. P. 56(c). Conversely, the presence of disputed material facts in the record renders summary judgment inappropriate. *Alliant Techsystems, Inc. v. Salt Lake Bd. of Equalization,* 2012 UT 4, ¶¶ 4, 31–32, 270 P.3d 441. "A disputed fact is material if it affects the rights and liabilities of the parties." *Id.* ¶ 31 (citation and internal quotation marks omitted).

¶ 21 The district court ruled that Northgate "gave formal notice of default on January 7, 2008," by sending a letter to the City after it "had already performed the clean up actions." The district court concluded that the timing of Northgate's notice gave the City no opportunity to cure its default and that, as a result, Northgate "cannot collect on the $2,000,000+ bill."

2. The City also argues that when Northgate did provide the City with notice of default, that notice did not offer the City a "right to cure." In the City's view, instead of allowing the City to cure by cleaning up items described in the Clean–Up List, Northgate cured the default itself and then sent the City the bill.

The terms of the contract freed Northgate to "pursue any remedies available to it ... under applicable law" once the notice window closed.

¶ 22 The Land Sale Contract does not require notice in a particular form and does not rule out oral notice:

If any party is in default under this agreement for a period of ninety (90) days following receipt of notice from the non-defaulting party, then the non-defaulting party may pursue any remedies available to it against the defaulting party under applicable law, including, but not limited to, specific performance of this Agreement.

Record testimony indicates that Northgate may have provided the City with oral notice of default well before January 7, 2008. One of Northgate's developers stated, "I believe every time we found another major strike we contacted the City Manager's office. I know that I personally met with [the City Manager] at least a half a dozen or more times." One of those meetings between Northgate and the City Manager took place in late 2005 or early 2006.

¶ 23 Because the language of the Land Sale Contract does not require written notice, the record testimony regarding oral notice in 2005 or 2006 creates a factual dispute. Northgate's rights and liabilities under the contract's default provision hinge on when the City received notice. The notice-date dispute is therefore material, and the presence of disputed material facts makes summary judgment on the opportunity-to-cure question inappropriate. *See Alliant Techsystems,* 2012 UT 4, ¶¶ 4, 31–32, 270 P.3d 441. We therefore vacate the district court's determination that Northgate did not provide the City with proper notice and an opportunity to cure.[2]

B. The "Written Action Plan"

¶ 24 Section 4.3.2 of the Land Sale Contract requires the City "to complete any environmental clean-up responsibilities speci-

Accordingly, before a court can reach the question of whether Northgate impermissibly rushed to excavate and bill the City when it should have waited for the City to cure, the court must first determine the notice date. Accordingly, because the parties' notice-date dispute remains unresolved, we do not reach the City's alternative opportunity-to-cure argument or any responses to it.

fied in the written action plan for the City Public Works Parcel." Northgate's second breach-of-contract argument hinges on which document the term "written action plan" refers to—the Environmental Site Assessment or the Clean–Up List.

¶ 25 Northgate contends that the district court erred in concluding that the term "written action plan" referred only to the attached Clean–Up List and not to the Environmental Site Assessment as well. Northgate maintains that the contract itself designates the Environmental Site Assessment "as a means by which Northgate may elect to cancel the agreement." Northgate also argues that the attached Clean–Up List unambiguously refers to the Environmental Site Assessment. Thus, Northgate reasons, "it is evident that the parties incorporated the contents of the Environmental Site Assessment" into the Land Sale Contract. The City responds that the district court correctly interpreted the contract.[3]

¶ 26 "[P]arties may incorporate the terms of another document by reference into their contract." *Housing Auth. v. Snyder*, 2002 UT 28, ¶ 19, 44 P.3d 724. But incorporation requires specificity: "the reference must be clear and unequivocal." *Id.* (citation and internal quotation marks omitted).

¶ 27 Here, Northgate's incorporation-by-reference argument rests on two references to the Environmental Site Assessment, one in the contract itself, the other in the attached Clean–Up List. The contract mentions the Environmental Site Assessment in section 3.2.1.1, a provision that allows Northgate to rescind the sale if it "finds the result of the environmental audit to be unacceptable." And a caption at the top of the Clean–Up List reads, "List of Environmental Concerns or Recognized Environmental Conditions from Phase I Environmental Site Assessment."

¶ 28 These two references to the Environmental Site Assessment do not satisfy the clear-and-unequivocal standard required for incorporation by reference. The Environmental Site Assessment appears in section 3.2.1.1 in the context of a pre-closing condition: if the Environmental Site Assessment did not satisfy Northgate for any reason, Northgate had the right to rescind the sale before closing. A reference to the Environmental Site Assessment in a pre-closing context does not incorporate the Environmental Site Assessment as a checklist for the City's post-closing clean-up responsibilities.

¶ 29 Similarly, the Clean–Up List caption's reference to the Environmental Site Assessment does not incorporate the Environmental Site Assessment into the Land Sale Contract. An environmental-audit team used the Environmental Site Assessment to develop the Clean–Up List. But the very fact that only the Clean–Up List was attached to the contract strongly suggests that the City was contractually obligated to remedy only those items from the Environmental Site Assessment that were also listed on the Clean–Up List. The parties could have incorporated the Environmental Site Assessment as the guide to the City's post-closing clean-up responsibilities by clearly and unequivocally referring to the Environmental Site Assessment in the section of the contract that described those responsibilities. But that section's reference to a "written action plan" does not clearly and unequivocally refer to the Environmental Site Assessment.

---

3. The City also contends that by closing on the property, Northgate "waived claims arising out of the environmental audit as a matter of law." "Waiver of a contractual right occurs when a party to a contract intentionally acts in a manner inconsistent with its contractual rights, and, as a result, prejudice accrues to the opposing party ... to the contract." *Mid–America Pipeline Co. v. Four–Four, Inc.*, 2009 UT 43, ¶ 17, 216 P.3d 352. Because waiver is an intensely fact-dependent question, *IHC Health Servs., Inc. v. D & K Mgmt., Inc.*, 2003 UT 5, ¶ 7, 73 P.3d 320, a "district court should exercise care in granting summary judgment" in the waiver context, *IHC Health Servs., Inc. v. D & K Mgmt., Inc.*, 2008 UT 73, ¶ 18, 196 P.3d 588, particularly " 'if the inferences depend upon subjective feelings or intent,' " *Uintah Basin Med. Ctr. v. Hardy*, 2008 UT 15, ¶ 19, 179 P.3d 786 (quoting 73 Am.Jur.2d *Summary Judgment* § 46 (2001)). Though the district court mentioned the City's waiver argument, waiver did not figure into the court's analysis. We agree with the district court's approach. Given the fact-dependent nature of the City's waiver argument, the district court properly excluded that argument from its summary judgment analysis.

¶ 30 Instead, the Land Sale Contract mentions the Environmental Site Assessment only in the section of the contract dealing with pre-closing contingencies. That solitary reference suggests that the parties intended the Environmental Site Assessment and the Clean–Up List to play separate and distinct roles in the purchase process. The Environmental Site Assessment acted as an inspection, Northgate's approval of which was a condition precedent to closing. The Clean–Up List acted as a punch list of items the City was required to remedy after closing. In a separate contract provision, the City assumed responsibility for taking the actions detailed in that "written action plan."

¶ 31 We affirm the district court's determination that the Land Sale Contract did not incorporate the Environmental Site Assessment or Table 1.1, which is contained in the Environmental Site Assessment. Accordingly, we agree that the Land Sale Contract obligates the City "to perform only those clean-up actions listed in the ... Clean–Up List attached to the agreement."

## C. The City's Clean–Up Obligations

¶ 32 Northgate argues that the district court incorrectly interpreted the Clean–Up List. According to the district court's interpretation, the Clean–Up List required the City to clean up buried transformers but allowed the City to resolve other environmental issues by applying for "necessary permission to leave the debris and landfill" on site. Northgate describes that interpretation as incongruent and implausible. In short, Northgate reasons, "there is no legal or factual basis for the district court to conclude that the [Land Sale Contract] obligated [the City] to remove the buried transformers but not the other buried debris identified as environmental concerns or conditions."

¶ 33 The City responds that the Clean–Up List mentions only one type of subsurface debris—the "buried electrical transformers." The City argues that the Land Sale Contract states that the City "shall not be required to

perform any filling or grading" and lacks "an express contractual agreement to be responsible for subsurface soil conditions." Thus, the City concludes, the contract required it to clean up only surface debris and one type of buried material—the electrical transformers.

¶ 34 "A contractual term or provision is ambiguous if it is capable of more than one reasonable interpretation because of uncertain meanings of terms, missing terms, or other facial deficiencies." *Daines v. Vincent,* 2008 UT 51, ¶ 25, 190 P.3d 1269 (citation and internal quotation marks omitted). Contract-term ambiguity exists only when the parties' contrary positions are each tenable. *Plateau Mining Co. v. Utah Div. of State Lands & Forestry,* 802 P.2d 720, 725 (Utah 1990).

¶ 35 The question of whether a contract contains facial ambiguity requires the district court to make a legal determination. *Daines,* 2008 UT 51, ¶ 25, 190 P.3d 1269. We review that determination for correctness. *Saleh v. Farmers Ins. Exch.,* 2006 UT 20, ¶ 14, 133 P.3d 428. But when facial ambiguity exists and the competing interpretations both enjoy evidentiary support, the parties' intent becomes "a question of fact to be determined by the jury." *Plateau Mining,* 802 P.2d at 725. A district court may interpret contract terms at summary judgment without reference to parol evidence "only when [the] terms are complete, clear, and unambiguous." *Colonial Leasing Co. of New England v. Larsen Bros. Constr. Co.,* 731 P.2d 483, 488 (Utah 1986).

¶ 36 Though the Land Sale Contract requires the City to perform only the clean-up actions contained in the Clean–Up List, we agree with Northgate that the Clean–Up List contains ambiguities. Specifically, the Clean–Up List does not clearly indicate how the City must deal with buried asphalt.

¶ 37 The district court determined that the Clean–Up List required the City to remove buried electrical transformers.[4] Accordingly,

---

4. The Clean–Up List indicates that buried transformers may contain polychlorinated biphenyls (PCBs). PCBs are a type of Persistent Organic Pollutant (POP). *See Persistent Organic Pollu-*

*tants: A Global Issue, a Global Response,* EPA (July 30, 2012), http://www.epa.gov/international/toxics/pop.html. Studies link POPs to "reproductive, developmental, behavioral, neurologic, en-

the district court required the City to reimburse Northgate for the cost of removing the transformers. The district court added that the remaining Clean–Up List requirements "relate to permitting" and that the City "received the necessary permission to leave the debris and landfill." One item on the Clean–Up List reads, "Landfill operations—burial of asphalt materials—Check permitting & closure requirements including Coordination with State of Utah Division of Solid & Hazardous Waste." But in the section of the Clean–Up List describing the City's clean-up responsibilities in the "Soil Borrow & Landfill Area," there are three entries:

1. Landfilling construction materials with pieces of asphalt
2. Permit required for continued landfilling
3. Site assessment and application required for closure of site

Northgate and the City ascribe contrary meanings to this section of the Clean–Up List. In the City's view, the first and second entries should be read together, allowing the City to fulfill its obligation to clean up the asphalt by simply applying for and receiving proper permits. In Northgate's view, the first and second entries impose separate requirements: the City must clean up the "construction materials with pieces of asphalt" and must also apply for and receive permits for any continued landfilling.[5]

¶ 38 Both the City's reading and Northgate's are plausible. Consequently, without reference to parol evidence of the parties' intent, we see no way to select one reading of the asphalt provision over the other. *See Plateau Mining*, 802 P.2d at 725. The Land Sale Contract therefore contains a facial ambiguity, and resolving this facial contract ambiguity requires evidence of the parties' in-

tent. *See id.* Because "the intent of the parties is a question of fact to be determined by the jury," the district court erred by determining at summary judgment that the City could fulfill its asphalt clean-up responsibilities by securing the proper permits. *See id.* We therefore vacate the district court's determination on this issue.

¶ 39 The parties' intent with respect to the City's asphalt clean-up responsibilities thus presents a question of fact for the fact-finder. In addition, as explained in Part I.A., a factual dispute remains as to when Northgate gave the City notice of a breach. So while we affirm the district court's determination that the Clean–Up List defines the City's contractual clean-up obligations, we reverse the district court's grant of summary judgment to the City on Northgate's breach-of-contract claim and remand to allow the fact-finder to determine the parties' intent with respect to these issues.

## II. Breach of the Covenant of Good Faith and Fair Dealing

¶ 40 Northgate next contends that the district court erred in concluding that the City had not breached its implied covenant of good faith and fair dealing. Northgate reasons that the implied covenant barred the City "from taking any action that would interfere with Northgate's ability to receive [government redevelopment] funds." In Northgate's view, the City breached the implied covenant "when it unilaterally overruled [agency] approval of Northgate's application and refused to provide the [redevelopment] funds to Northgate."

¶ 41 The City responds that it "had no legal obligation whatsoever to assure that Northgate" obtained redevelopment funds.

docrine, and immunologic adverse health effects." *Id.*

5. Buried asphalt presents an environmental hazard. "Asphalt binder is the product of the distillation of crude oil in petroleum refining." Paulo R.N. Fernandes et al., *Evaluation of Polycyclic Aromatic Hydrocarbons in Asphalt Binder Using Matrix Solid–Phase Dispersion and Gas Chromatography*, 47 J. Chromatographic Sci. 789, 789 (2009), *available at* http://chromsci.oxfordjournals.org/content/47/9/789.full.pdf. The

production and degradation of asphalt may release polycyclic aromatic hydrocarbons (PAHs) which, like the PCBs found in buried transformers, "form part of the group of compounds known as persistent organic pollutants (POPs)." *Id.* at 790. In addition to the health effects of POPs listed above, *see supra* ¶ 37 n. 4, studies reveal a possible link between PAHs and cancer, and "there is a relation between carcinogenesis and the molecular structure of PAHs." *See* Fernandes et al., *supra*, at 789.

Section 3.2.4 of the Land Sale Contract states that the City "cannot make any representations to Northgate as to whether Northgate will receive [redevelopment] funds." The City argues that to qualify for the funds, Northgate "would have needed to commit to create at least one job for each $35,000" of redevelopment funding it. received. Northgate "could not or would not" make that commitment, "and therefore it did not qualify for the federal money." The City concludes that Northgate's failure to receive funds "is a self-inflicted wound."

¶ 42 The implied covenant of good faith and fair dealing "infer[s] as a term of every contract a duty to perform in the good faith manner that the parties surely would have agreed to if they had foreseen and addressed the circumstances giving rise to their dispute." *Young Living Essential Oils, LC v. Marin*, 2011 UT 64, ¶ 8, 266 P.3d 814. As a natural consequence, "[n]o such covenant may be invoked ... if it would create obligations 'inconsistent with express contractual terms.'" *Id.* ¶ 10 (quoting *Oakwood Village LLC v. Albertsons, Inc.*, 2004 UT 101, ¶ 45, 104 P.3d 1226).

¶ 43 Invoking the covenant of good faith and fair dealing on this record would create the type of inconsistency *Young Living* forbids. Had the Land Sale Contract been silent as to the City's obligations regarding the government redevelopment funds Northgate sought, Northgate's implied-covenant claim would be plausible. But here, we need not speculate about what "the parties surely would have agreed to if they had foreseen and addressed" the City's role in the redevelopment-fund application process. The parties foresaw the City's involvement and addressed the issue by including a disclaimer: "The City cannot make any representations to North-gate as to whether Northgate will receive these [government redevelopment] funds." Given this contract term, we cannot imply a representation that Northgate will receive the funds provided certain conditions are met.

¶ 44 Northgate urges us to conclude that the implied covenant of good faith and fair dealing barred the City from taking any action that impeded Northgate's pursuit for redevelopment funds. Because the City played an intermediary role in the redevelopment-fund application process, Northgate's preferred approach would have obligated the City to endorse Northgate's application so long as the other relevant agencies agreed that the application was meritorious. However, given the City's express disclaimer with respect to the availability of the funds, to read the provision as requiring the City to approve the application if certain other conditions were satisfied would require us to imply a contractual term at odds with a term agreed upon by the parties.

¶ 45 Furthermore, Northgate points to no evidence that the City, by denying Northgate's application for redevelopment funds, intended to "destroy or injure" Northgate's "right to receive the fruits of the contract." *Oakwood Village*, 2004 UT 101, ¶ 43, 104 P.3d 1226. To the contrary, the record here supports the City's assertion that it denied Northgate's application through its ordinary deliberative process. Accordingly, we see no basis to invoke the implied covenant here. *Young Living*, 2011 UT 64, ¶ 10, 266 P.3d 814.

¶ 46 We therefore affirm the district court's summary judgment in favor of the City on Northgate's claim for breach of the implied covenant of good faith and fair dealing with respect to redevelopment funds.

## III.  Equitable Claims

¶ 47 Finally, Northgate contends that the district court erred by dismissing its equitable claims. Northgate maintains that "it is improper to dismiss an unjust enrichment or equitable restitution claim at the pleading stage merely because a contract claim has been pleaded in the alternative." The City responds that because the parties addressed their rights and remedies by contract, "alternative equitable claims have no place in the complaint."

¶ 48 Our rules of civil procedure do not limit the number of claims or defenses a party may plead. Utah R. Civ. P. 8(e). The parties' freedom at the pleading stage applies regardless of the pleaded claims' consistency or the fact that some claims are based on

legal grounds and others on equitable grounds. *Id.* But at later stages of the proceeding, consistency requirements limit the freedom the parties enjoyed at the pleading stage.

¶ 49 "[R]estitution and unjust enrichment are remedies found in quantum meruit." *TruGreen Cos. v. Mower Bros., Inc.*, 2008 UT 81, ¶ 18, 199 P.3d 929. And "[r]ecovery under quantum meruit presupposes that no enforceable written or oral contract exists." *Davies v. Olson*, 746 P.2d 264, 268 (Utah Ct.App.1987). Therefore, as the federal district court for the Northern District of Georgia explained, though the parties "may raise alternative theories on breach of contract and quantum meruit at the pleading stage, once the court has determined that a valid contract governed the parties' relationship, that generally precludes a quantum meruit claim." *Importers Serv. Corp. v. GP Chems. Equity, LLC*, 652 F.Supp.2d 1292, 1303 (N.D.Ga.2009). Similarly, the federal district court for the Eastern District of Pennsylvania approved the dismissal of a quantum meruit claim when the parties did not dispute that a contract existed and the "scope of the contract" included the transaction that was "the basis for the quantum meruit claim." *Philadelphia Hous. Auth. v. CedarCrestone, Inc.*, 562 F.Supp.2d 653, 656 (E.D.Pa.2008). In short, though the parties are free to plead equitable claims in contract cases, a court may dismiss quantum meruit claims if it later concludes that an enforceable contract exists and governs the subject matter of the dispute.

¶ 50 At the outset of litigation, whether an enforceable contract exists or whether a contract covers the parties' dispute may be unclear. Because a claim should be dismissed only if "it appears to a certainty that the plaintiff would be entitled to no relief under any state of facts which could be proved in support of the claim," a district court should not dismiss alternative equitable claims if the existence or applicability of a contract remain in dispute. *See*

*Mack v. Utah State Dep't of Commerce*, 2009 UT 47, ¶ 17, 221 P.3d 194 (citation and internal quotation marks omitted).

¶ 51 For these reasons, the district court arguably acted prematurely by dismissing Northgate's equitable claims at the pleading stage. But we disregard any error unless it affects the substantial rights of the parties. Utah R. Civ. P. 61. "If the error was sufficiently inconsequential that there is no reasonable likelihood that it affected the outcome of the case, then a reversal is not in order." *Price v. Armour*, 949 P.2d 1251, 1255 (Utah 1997). We therefore need not determine whether the district court erred in dismissing Northgate's alternative equitable claims at the pleading stage, because any error in that ruling was ultimately cured.

¶ 52 Through its equitable claims, Northgate seeks compensation for excavation and disposal of landfilled materials on the Public Works Parcel. But Northgate and the City allocated responsibility for excavation and disposal in the Land Sale Contract. Nothing in the record suggests that the Land Sale Contract is unenforceable. And the Land Sale Contract squarely governs the subject matter of this dispute: who bears the responsibility for excavating and disposing of the landfilled materials.

¶ 53 Northgate maintains that it may have prevailed on its equitable claims "in the event the district court determined that the parties did not reach a meeting of the minds or that [the City] made a separate representation regarding the clean-up." But Northgate offers no evidence that the parties did not reach a meeting of the minds or that the City made extra-contractual clean-up representations.

¶ 54 Northgate also argues that "regardless of the enforceability or scope" of the Land Sale Contract, "public policy and principles of equity" render its equitable claims actionable.[6] In support of this policy argument, Northgate cites two cases. In the

---

6. Northgate emphasizes the result of the "public policy" it invokes—the policy would hold the City responsible for "its continued and repeated violations of the law." But Northgate does not indicate what accepted policy demands that result, and aside from the federal cases distinguished here offers no authority supporting its position.

first, *Moore v. Texaco, Inc.,* the plaintiff sought to recover under an unjust-enrichment theory because he had performed the defendant's "statutory duty to remediate pollution." 244 F.3d 1229, 1233 (10th Cir.2001). In the second, *Ergon, Inc. v. Amoco Oil Co.,* the plaintiff sought to recover clean-up costs under an unjust-enrichment theory in the absence of a contract allocating clean-up responsibility. 966 F.Supp. 577, 586 (W.D.Tenn.1997). Neither case involved granting equitable relief unavailable under a contract governing the same subject matter. Accordingly, Northgate has failed to demonstrate that the outcome of this case would have been different if the district court had not dismissed its equitable claims prematurely. *See Price,* 949 P.2d at 1255. We therefore affirm the district court's dismissal of Northgate's unjust-enrichment and restitution claims.

## CONCLUSION

¶ 55 We vacate the district court's ruling on the opportunity-to-cure issue, but we affirm the district court's determination that the Land Sale Contract did not incorporate the Environmental Site Assessment or Table 1.1. Because we recognize facial ambiguities in the Clean–Up List, we vacate the district court's determination that the City satisfied its clean-up obligations. We reverse the district court's grant of summary judgment and remand to allow the district court to hear evidence regarding the parties' intent with respect to asphalt clean-up and, if necessary, evidence of when Northgate provided the City with oral notice of a breach. Finally, we affirm the district court's summary judgment ruling that the City did not breach the implied covenant of good faith and fair dealing and affirm the district court's dismissal of Northgate's alternative equitable claims.